STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. JOSEPH H. CARR, PLAINTIFF IN ERROR.

Argued May 3, 1936—Decided October 14, 1936.

Before BROGAN, CHIEF JUSTICE, and Justices CASE and PERSKIE.

For the defendant in error, *Samuel P. Orlando,* prosecutor of the Pleas.

For the plaintiff in error, *Carl Kisselman* and *George D. Rothermel.*

BROGAN, CHIEF JUSTICE. The plaintiff in error, Joseph H. Carr, was convicted of embezzlement as bailee of the Camden Safe Deposit and Trust Company (hereinafter called "the Bank") under section 184 of the Crimes act, in that as such bailee he did willfully, fraudulently and unlawfully take, embezzle and convert moneys of the said Bank to his own use with intent to cheat and defraud.

There were eighteen counts in the indictment all directed to the one unlawful act charged. Six of these counts, which charged plaintiff in error with embezzlement as servant of the Bank or of one Bernhard G. Leuthy, were abandoned by the state at the end of the state's case. The twelve remaining counts charged the plaintiff in error with embezzlement of certain tax certificates, or money representing their value, as bailee or agent of either the said Bank or Bernhard G. Leuthy.

The evidence produced by the State, which must be recited in some detail, tended to show that the Bank was owed considerable money by one J. Edward Fagen, who was conducting the affairs of a real estate corporation known as Marlton Pike Manor. The Bank had also advanced money to Lippincott Company, a corporation. Both companies were developing lands owned by them located in Delaware township, Camden County, New Jersey. A creditors' committee was in charge of the affairs of Mr. Fagen and among the members of that committee were Ephraim Tomlinson, the president of the Bank, and Joseph H. Carr, plaintiff in error. The lands of both these companies were about to be sold in October, 1930, for unpaid taxes for the year 1928 only. It appears that there were unpaid taxes on these lands for the subsequent year, which, under the statute (Tax act, Revision 1918) were

also in default as of July, 1930. Carr, who was a member of the bar of this state, advanced the idea to Tomlinson that it would be for the best interests of the creditors of these two companies if an arrangement might be made to buy in these properties at the tax sale; that it would be advantageous to have the tax sale certificates purchased by friendly interests and would result in considerable saving on the cost of redemption. Carr suggested that a loan be made to Bernhard G. Leuthy, a young lawyer in his office, and Grover C. Chase, a friend, who would purchase the lands at the tax sale which was to be held in a few days. The certificates were to be assigned by the purchasers (who were "straw" men) to the Bank as security for the moneys advanced to purchase the tax titles. The Bank advanced the moneys and Carr purchased the lands in the names of Messrs. Leuthy and Chase. These purchasers each executed a note for $6,000 and delivered same to the Bank.

When the loan was made on the Leuthy and Chase notes, neither of these men had an account with the Bank. The sum advanced was placed in a sundry account and by their drafts it was placed to the credit of Carr, who likewise, at that time had no account with the Bank. At the sale, Carr, by check on the Bank, paid the tax collector for the certificates.

On the date of the purchase of the tax sale certificates, October 25th, 1930, Leuthy and Chase each executed an assignment to the Bank of the tax sale certificates which had been purchased in their respective names. About a month later Carr wrote to Tomlinson, enclosing an itemized list of the tax sale certificates, advising that they had been sent to the register of the county to be recorded and when recorded would be sent to the Bank as collateral. The Bank advanced additional moneys for recording fees and incidental expenses. On December 28th, 1932, Chase withdrew from the transaction and Leuthy signed and delivered to the Bank his note for the total amount of the loan to Chase and himself, including interest, fees and expenses.

It appears that the tax sale certificates never were delivered to the Bank but were returned from the office of the register of deeds to Carr, who retained them.

Delaware township later advertised the same lands for sale for unpaid 1929 taxes and certain assessments. Carr filed bills in the Court of Chancery in the names of Leuthy and Chase, as complainants, to restrain the sale on the ground that at the time these lands were sold for the 1928 taxes, *i. e.,* in October, 1930, the 1929 taxes had been in fact in default since July 1st, 1930, the point being that under the revised Tax act (*Pamph. L.* 1918, *p.* 847, and its amendments and supplements) a municipality is not empowered to sell *subject* to taxes, &c. (*i. e.,* the 1929 taxes) already delinquent. The court granted an injunction but permitted the municipality to readjust its position by the alternative of refunding to these complainants the moneys paid for the 1928 tax sale certificates. See *Chase* v. *Township of Delaware,* 108 *N. J. Eq.* 328.

At the hearing in that case Mr. Carr testified that he purchased the lands in the name of the nominees for the benefit of the committee of creditors. When the refund of these moneys to the purchasers at the tax sale was not forthcoming, Carr started to foreclose the tax sale certificates as a result of which Delaware township hastened to redeem the certificates with interest and costs, Mr. Carr receiving the money. The settlement was made on January 4th, 1934.

Carr did not advise the Bank that these certificates had been redeemed and that he had received the money. The testimony is that he denied that settlement had been made; that the Bank did not learn of the settlement until September 20th, 1934, when one of its officials ascertained it from the solicitor of Delaware township. At that time Carr was away on vacation in the State of Maine. Telephone conversations ensued between the Bank's representative and Carr and a letter from Carr followed. The letter stated that the money had been received but that Carr had not yet completed the settlement; that there were collateral matters which first must have attention and which the writer thought could be cleared up in October. A witness, one of the Bank's officers who had received the letter from Carr, testified that he saw Carr in October and that Carr admitted he had collected the money and used it for purposes of his own and that he believed he

would be able to pay $5,000 of the amount due the Bank from a fee which he expected to collect. This promise did not materialize. There was another conference at the offices of the Bank between Mr. Annis, vice-president of the Bank, Mr. Norcross, its counsel, and Mr. Carr. Annis stated to the Bank's attorney, in the presence of Carr, that Carr had admitted collecting the proceeds of the tax sale certificates and had used the money for his own benefit; that he hadn't notified the bank that he had collected the money and that he was now offering to assign certain fees which were due him in several matters. Carr, according to the testimony of this witness, Mr. Annis, admitted that the recitation of the facts, as outlined by Mr. Annis to Mr. Norcross, was an accurate statement of his position.

As against this evidence offered by the state, the plaintiff in error says that when, in October, 1930, he spoke to Tomlinson about the purchase of the tax certificates, by the bank, Tomlinson was not in accord with the plan and thereupon he, Carr, conceived the notion that he might, with profit to himself, purchase the lands at the tax sale, having in mind the very thing that happened, namely, that the sale would have to be rescinded, and that he would receive eight (8%) per cent. interest on the money paid for the tax titles, as well as the fees incident to the work, and that he persuaded Tomlinson to advance the money for this purpose; that the money was advanced for Carr's benefit, to Leuthy and Chase, his nominees. Carr also testified that $1,500 of the total sum loaned by the bank, which the state contended was a fee for Carr's services, was in fact an advance to cover the cost of searching the tax titles preliminary to foreclosing. In a word, the contention of the plaintiff in error is that the transaction between himself and the Bank was entirely independent of any bailment or agency; that he was in reality the principal in the whole transaction; that he bought the tax certificates as a venture of his own with the money borrowed from the Bank through the medium of his nominees; that a relationship of debtor and creditor, and nothing more, existed, while it is the theory of the state that he acted as bailee or agent throughout and that the appropriation of the

money by him was a conversion of the fund which amounted to an embezzlement under the statute.

After this resume of the facts, we take up one of the assignments of error—that the verdict was against the weight of the evidence. We cannot say that the verdict should be set aside as being contrary to the weight of the evidence. To do so would be to hold that the verdict was the result of prejudice, passion, mistake or partiality. We can arrive at no such determination in this matter for the reason that there was ample, definite and persuasive evidence to justify the jury's finding.

Proceeding to the other grounds presented in support of a reversal, it is argued that the plaintiff in error was not the bailee of the bank and was not entrusted with the collection or care of money.

The one hundred and eighty-fourth section of our Crimes act (2 *Comp. Stat., p.* 1799) reads as follows:

"Any consignee, factor, bailee, agent or servant, entrusted with the care or sale of any personal property, or entrusted with the collection or care of any moneys, who shall fraudulently take or convert the same, or the proceeds of the sale of the same, or any part thereof, to his own use, or to the use of any other person or persons whatsoever, except the rightful owner thereof, shall be guilty of a misdemeanor. *Pamph. L.* 1898, *p.* 844."

From the testimony before us, it is plain that the jury was justified in finding, as it did, that the relationship of the parties was not that of debtor and creditor. That conclusion seems to be unassailable. Carr was not the maker of the notes in the transaction; the money was not loaned to him personally; he purchased the certificates not for himself but for the creditors' committee; he was aware of the assignment of the certificates by the nominees to the bank; in fact the inference is that he drew the assignments; he knew that Chase had withdrawn and been released from the note obligation and had assigned his interest to Leuthy; that Leuthy had undertaken the additional note indebtedness and had assigned the entire lot of certificates to the Bank. On the return of the certificates to Carr from the office of the county

register, he retained them and on their redemption by the township, he received the money which they represented and appropriated it to his own use.

We next consider whether, under the proofs, a bailment existed. A bailment may be created without actual, manual delivery. It may be constructive. Indeed a bailment may be spelled out of circumstances which surround a situation where one lawfully obtains possession of personal property of another and is bound to account for such property.

"An actual bailment exists where there is either (a) an actual delivery consisting in giving to the bailee or his agent the real possession of the chattel, or (b) a constructive delivery consisting of any of those acts which, although not truly comprising real possession of the goods transferred, have been held by legal construction equivalent to the acts of real delivery.

"A constructive bailment arises where the person having the possession of the chattel holds it under such circumstances that the law imposes upon him the obligation to deliver it to another." *Gilson* v. *Pennsylvania Railroad,* 86 *N. J. L.* 446, 448.

The jury had a right to find that there was a constructive bailment of the certificates when Carr received them from the register of the county, to whom they had been sent for recording. So we conclude that Carr, under the proofs, was properly found to be a bailee of the certificates; that in his capacity as attorney, when the certificates were redeemed, he was bailee of the money received.

From all of this, it follows that the jury was justified in finding that Carr, as such bailee, was entrusted with the care or sale of personal property or entrusted with the collection or care of money.

It is next argued that the Bank was not the rightful owner of the moneys alleged to have been embezzled and that Carr was the rightful owner. We find no merit in this point. The evidence which has been reviewed makes it apparent that the Bank had a property right in these certificates, by assignment, at least up to the amount of the loan, from those persons in whose names the certificates stood; that Carr became

the bailee and that the Bank possessed property rights in the certificates or the moneys arising from their redemption, and that the appropriation of this money by Carr was, under the facts, an embezzlement under the statute.

It is also urged that at the time the assignments were executed by Leuthy and Chase it was an assignment at best of tax sale certificates not yet in existence and they amounted to nothing more than agreements for a pledge. Be that as it may, the argument entirely overlooks the fact that on December 28th, 1932, when these certificates were in existence, Leuthy, who had taken over the interest of Chase, executed an agreement specifically calling for the turning over of the certificates in question to the Bank so that what the plaintiff in error charges in part of his argument to be an equitable assignment became actual.

It is next argued that the transaction in question amounted to a pledge or agreements to pledge and the reasoning is grounded, as indeed it must be, on the fundamental that Carr was the pledgor. This assumption is contrary to the fact, as the jury found it, and, in our view, no discussion of this point is necessary.

It is further said that the court erred in declining to charge the jury as follows: "The defendant, Carr, is not bound to prove any special defense which he may have, except by a preponderance of the proof and though his defense be not conclusively proven, yet if it raises a reasonable doubt of his guilt he is entitled to the benefit of that doubt and he should be acquitted."

No harm came to the plaintiff in error because this request was rejected. The court clearly charged the jury that the plaintiff in error was presumed to be innocent until proven guilty beyond reasonable doubt. The learned judge went further and stated that this rule was very real and substantial in fact and in law, and instructed the jury that the presumption of innocence accompanies every defendant until proved to be guilty. The court then proceeded to define reasonable doubt in language which has been approved by our court of last resort. It is not required that a trial judge accept the language of a request to charge in the words presented by

counsel so long as the subject-matter of the request has been charged in language that is legally correct.

It is next urged that the trial court erred in refusing to admit into evidence the form of intended assignment (Carr to Ephraim Tomlinson) of the tax sale certificates. The assignment had never passed and, to us, appears to have been entirely irrelevant.

It is also argued that the court erred in denying the motion to dismiss the indictment for the reason that the same violated the requirements of the forty-seventh section of the Criminal Procedure act. The argument is that the indictment charged a number of distinct offenses committed against different masters. The point has no merit for the reason the indictment charges the same act, considered from separate aspects or relationships, and nothing more.

It is also urged that the trial court erred in denying motion of the plaintiff in error to require the state to elect upon which count or counts it would rely. We see no error in this. Each and every count of the indictment was directed toward the single act or course of conduct on the part of the plaintiff in error, alleged to have been criminal in character. The offense charged was the embezzlement either of the certificates or the money resulting from their redemption, by the plaintiff in error either as bailee or agent. There could be no possible misunderstanding by the plaintiff in error as to just what the state was endeavoring to prove.

We find no error and the judgment is affirmed.