### Hudson County Circuit Court.

CONTEST OF THE ALLEGED ELECTION OF HARRY ERICK-
SON AS A MEMBER OF THE REPUBLICAN COUNTY
COMMITTEE IN HUDSON COUNTY. JAMES W. McCAR-
THY, Jr., PETITIONER.

CONTEST OF THE ALLEGED ELECTION OF ELSA GELBKE
AS A MEMBER OF THE REPUBLICAN COUNTY COM-
MITTEE IN HUDSON COUNTY. ANITA McCARTHY,
PETITIONER.

Decided December 21, 1939.

For the petitioners, *August Ziegener* and *Julius Seiden.*

For the incumbents, *Benjamin J. Dowden.*

BROWN, C. C. J. In the Republican primary election held
in the fifty-fourth district of the seventh ward of Jersey City,
Hudson county, New Jersey, on September 19th, 1939, Harry
Erickson and James W. McCarthy, Jr., were the male candi-

dates and Elsa Gelbke and Anita McCarthy were the female candidates for election as members of the Republican county committee. Under the law but one male and one female could be elected. Neither Harry Erickson nor James W. McCarthy, Jr., were declared elected as they received a tie vote. Elsa Gelbke was declared the successful female candidate. The petitioners contest both of those elections. Under *R. S.* 19:29-1, the nomination or election of any person to office or party position may be contested upon several grounds including "malconduct, fraud or corruption on the part of the members of any district board, or of any *members* of the board of county canvassers, sufficient to challenge the result;" and "when illegal votes have been received, or legal votes rejected at the polls sufficient to change the result." At the hearing and in the briefs presented on behalf of the petitioners all grounds were abandoned except the one last mentioned "sufficient to change the result." It is admitted by all the parties to the contest that the official returns as filed by the district election board, which conducted the election, that Elsa Gelbke received twenty votes; Harry Erickson twenty votes; Anita McCarthy nineteen votes and James W. McCarthy, Jr., twenty votes. A certificate of election was issued to Elsa Gelbke but no certificate was issued to either of the male candidates because of the tie vote. The petitioners contend that illegal votes were cast sufficient to change the result of the election. The petitions contain among other charges that Walter Gunderson, Joseph Laible and William Erickson voted illegally in the election in that they were not qualified to vote in the primary election held for the district and in the ward above mentioned as those persons did not *actually reside* in that district as required by *R. S.* 19:4-1, which provides in part: "Except as provided in sections 19:4-2 and 19:4-3 of this title, every person possessing the qualifications required by article II, paragraph I, of the Constitution of the State of New Jersey, as modified by the Nineteenth Amendment to the Constitution of the United States, and having none of the disqualifications mentioned in article II, paragraph I, of the Constitution of the State of

New Jersey, and being duly registered as required by this title, shall be entitled to vote in the polling place assigned to the election district in which he *actually resides,* and not elsewhere." By this last mentioned section of the Election law a voter is required to *actually reside* in the election district in which he wants to vote before his vote can be legally received. Joseph Laible, one of the voters, charged with having cast an illegal vote, testified that he lived for three years with his wife and child at 91 Fulton street, Jersey City; nevertheless, he voted in the primary election from 550 Garfield avenue, in the same city, for the candidates William Erickson and Elsa Gelbke. The address at 91 Fulton avenue, Jersey City, is not located within the election district the primary election of which is the subject of contest, while 550 Garfield avenue is located in that district. Laible's testimony in this connection is in part as follows: "*Q.* You have lived with your family at 91 Fulton avenue how long? *A.* About three years. * * * *Q.* You have lived continuously with your family, there is no disagreement? *A.* No. * * * *Q.* On September 7th they came to you, did they not, and asked you to transfer giving your residence with Mr. and Mrs. Rich at 550 Garfield avenue? *A.* I transferred my vote to that address myself. *Q.* To 550 Garfield avenue. *A.* Yes, sir. *Q.* They remained [the witness' family] at the Fulton avenue address, didn't they? *A.* That is right. *Q.* Now when did you file that transfer? *A.* I believe it was along in August, I am not so sure. *Q.* You remember the primary 1939, don't you, in September? *A.* That is right. *Q.* And that is the time that you were transferring in order to vote at that primary, weren't you? *A.* That is right. *Q.* And that transfer was filed by you, according to the official records of this county, on September 7th, 1939, twelve days before the election; you would not deny that? *A.* I was not so sure, to tell you the truth. *Q.* You would not deny it if it is in the record, that it is so? *A.* Most likely it is. * * * *Q.* Who was it that gave you, or how did you get hold of this transfer card? *A.* I don't remember, I think I got a transfer the first time when I registered down at the board of regis-

tration. * * * Q. Did somebody come and give you a card, or did you go with somebody to change your address from 91 Fulton avenue to 550 Garfield avenue? A. I don't just remember, I just can't remember. Q. You didn't live at 550 Garfield avenue, did you? A. No. Q. Well, somebody must have asked you to vote from 550 Garfield avenue, didn't they? A. Well, they didn't—— * * * Q. Why did you select that address? A. Because I knew a friend of mine that was running in the election and I voted for him once before. Q. No; why did you select that address if you didn't live there? A. The man was living in that district. Q. You were never at that address, never in the house? A. I have been in the house occasionally, not many times. Q. What doing? A. My brother-in-law lives in that house. * * * Q. You were living home with your family? A. That is permanent, yes, sir. Q. How did you select this address, why didn't you take some other number? A. Well, that is the only one I know lives down there in that neighborhood. Q. You never lived at that address? A. No, that is my brother-in-law's address. Q. It isn't that you didn't live there, I was wondering why you selected that number. Did you ask, or did anybody tell you to use that number? A. No, I did not. Q. You just took that out of your head? A. Well, at the time I changed my address to 550 Garfield avenue. Q. That wasn't your address, you didn't get permission from anybody to use that address? A. I didn't. * * * Q. You said you went in the district because you had a friend running, is that right? A. That is right. Q. And that was Harry Erickson, is that right? A. Yes, sir. Q. And the lady who was running with him was Mrs. Gelbke? A. I don't know the woman, to tell you the truth. Q. Did you vote for that woman? A. I believe I did. Q. And you voted for Erickson? A. That is right. Q. You did not vote for the McCarthys? A. No, sir."

Walter Gunderson, a voter charged with voting illegally, testified that he was twenty-six years of age; that he lived at 23 Danforth avenue, in Jersey City, for twenty-three years and was living at the last mentioned address on the date of the last primary election; nevertheless, he voted at that pri-

mary giving his residence as 48 Van Nostrand avenue, although he did not live or reside at any time at that address. Number 23 Danforth avenue is not located in the election district the primary election of which is the subject of contest, while 48 Van Nostrand avenue is located within that district. He testified he "just voted from that address" and further, "that is my voting address." This witness also testified that his vote was cast in favor of the candidates William Erickson and Elsa Gelbke and against James and Anita McCarthy. William Erickson, a voter who was charged with having voted illegally, testified that he was unmarried and on the day of the primary election and for two years previous thereto lived with his mother at 118 Dwight street, Jersey City, and that he voted as residing at 11 Armstrong avenue, although he never resided at that address. Number 11 Armstrong avenue is in the fifty-seventh election district of the seventh ward and was the residence of the candidate Erickson, who was the brother of the witness William Erickson. Number 118 Dwight street is not within the same election district. This witness also testified that he voted in favor of the candidates Erickson and Gelbke and against James and Anita McCarthy. The word "resident" as a test for holding public office as well as voting has been the subject of extensive debate from the early days of our government. The framers of the Constitution of the United States engaged in a long and violent dispute in their endeavor to find a meaning for that word which would be certain and not open to misinterpretation. They freely admitted the impossibility of success in their undertaking and evidently compromised on the use of the word "inhabitant" as a test for holding public office. Article I, Constitution of the United States and article IV, Constitution of the State of New Jersey. The American Institute of Law, which was organized by and composed of the most learned law professors of America as well as some of its leading jurists, found great difficulty in arriving at a common definition of the words "domicile" and "residence" and after many years of discussion and research this difficult question still remains in the vast state of the unsettled. A

reading of the topic "meaning of domicil" section 9, pages 17 to 65 of Restatement of the Law, American Law Institute, under title "Conflict of Laws," clearly demonstrates the confusion that still exists in the meaning of those words. This authority contains the following about the use of the word "residence:" "The word 'residence' is often but not always used in the sense of domicil, and its meaning in a legal phrase must be determined in each case. It is sometimes used as equivalent to 'domicil;' sometimes it has a broader meaning; and sometimes it has a narrower meaning. It may mean something more than domicil; the domicil, namely, at which a person is resident. On the other hand, it may mean something less than domicil; a dwelling-place adopted for the time being, but not necessarily with such an intention of making a home there as to create a domicil. The phrase 'legal residence' is sometimes used as equivalent of domicil. In statutes relating to taxation and voting, residence means domicil unless the contrary is indicated in the statute." A reading of the decisions of the appellate courts of New Jersey in dealing with the meaning of the words "resident" and "domicile" shows that they have been usually construed in their ordinary and popular meaning. In the case of *Cadwalader* v. *Howell*, 18 *N. J. L.* 138, the court construed the Election law then in effect (1840) which provided among other things that a voter to be entitled to vote must have "resided in the county where he claims a vote, for at least one year immediately preceding the election." It will be seen that the Election law at that time was not as exacting as the Election law in effect at the last primary election in that the word "actually" was not contained in the act of 1840. On the subject of a voter's residence, in the Cadwalader case the court had the following to say: "When the statute required that the voter should have resided in the county, &c., it meant that he should have had his home there. In the seventh section, the right to vote was limited to that township in which he usually resided, &c. It did not mean, however, that he must have eaten and lodged there continuously for the space of a year, to entitle him to his vote. It did

not mean that he was not to absent himself during the year, for special purposes of pleasure, or business, either with or without his family. It meant nothing more than that he should have his home, his residence, within the county, for such space of time. It is important therefore, that we understand what the law means by residence. The word residence (fixed residence I mean), is generally used as tantamount to, domicile; though I am not prepared to say whether they are or are not in all respects, convertible terms. Thus in *Guier* v. *O'Daniel,* 1 *Binn. R.* 352, *n.,* it is said that a domicile may be defined to be a residence at a particular place, accompanied with positive or presumptive proof of continuing it an unlimited time. So Kent, in his commentaries, volume 1, page 76, national domicile; and Vattel has defined it in substantially the same way. Judge Story says, that domicile in a legal sense, is where the person has his true, fixed and permanent home and principal establishment, and to which whenever he is absent, he has the intention of returning. *Story, Conflict of Law* 39. Such domicile once obtained, remains to the possessor thereof, notwithstanding occasional visits to foreign countries, and until other domicile is acquired. *The Friendschaf* v. *Winn et al., Claimants,* 3 *Wheat. R.* 14; *The Nereide, Bennett, Master,* 9 *Cranch* 388; *Jennison* v. *Hapgood,* 10 *Pick. R.* 77; *Bruce* v. *Bruce,* 2 *Boss. & P.* 228; *Harvey* v. *Richards,* 1 *Mason C. C. R.* 408; *Richards* v. *Dutch,* 8 *Mass. R.* 506; *Dawes* v. *Boylston,* 9 *Mass. R.* 337. This principle is applied to cases of national residence; and so in pauper cases, it is applied to questions of domestic settlement. The settlement or legal residence of a pauper, is *prima facie* at the place of his birth, and this settlement continues until a new one is gained; there can be no suspension of it. 3 *Burns Just.* 365, 488; *St. John's Wapping and St. Botolph's Bishopgate, Burr. Sett. Cas.* 367. I do not mean to say that the elective franchise of the citizen may not be suspended, for, pending the year's residence required by our statute, the fact is so; but I mean to say, that a residence at law once obtained, continues without intermission until a new one is gained. In *Harral* v. *Harral* (*Court*

*of Errors and Appeals*), 39 *N. J. Eq.* (at *p.* 285), in discussing the question of change of residence the court said: "There must be a voluntary change of residence; the residence at the place chosen for the domicile must be actual; to the *factum* of residence there must be added the *animus manendi;* and that place is the domicile of a person in which he has voluntarily fixed his habitation, not for a mere temporary or special purpose, but with a present intention of making it his home, unless or until something which is uncertain or unexpected shall happen to induce him to adopt some other permanent home." In the case of *Stout* v. *Leonard,* 37 *N. J. L.* 492, the Court of Errors and Appeals, in its decision in that case, explained the difference between the words "residence" and "domicile" in the following statement: "Residence is not domicil, though domicil is the legal conception of residence. Domicil is residence combined with intention. It has been well defined to be a residence at a particular place, accompanied with positive or presumptive proof of an intention to remain there for an unlimited time. A man can have but one domicil for one and the same purpose at any one time, though he may have numerous places of residence. His place of residence may be, and most generally is, his place of domicil, but it obviously is not by any means necessarily so, for no length of residence without the intention of remaining will constitute domicil." In the case of *Snyder* v. *Callahan,* 3 *N. J. Mis. R.* 259, which involved the question of the legal residence of a voter and change of residence, the court adopted the following test: "The general rule in respect to the acquisition of a new domicile is, that after a person has abandoned his domicile of origin, or his acquired domicile, his domicile will be considered to be in that place in which he has voluntarily fixed a present intention of making it his home, unless, or until, something which is uncertain or unexpected should happen to induce him to adopt some other permanent home." Bouvier's Law Dictionary defines "domicile" as "that place where a man has his true, fixed and permanent home and principal establishment and to which whenever he is absent he has the intention

of returning." An "abode" by the same authority is stated to be "where a person dwells; it is the criterion determining the residence of a legal voter and must be with the present intention not to change it." The words "actual residence" appears in the Election law of the State of New Jersey as early as the year 1898 (see *Pamph. L.* 1898, *p.* 272), and again in further amendments to the Election law as appears in *Pamph. L.* 1920, *p.* 629; *Pamph. L.* 1921, *p.* 517, and *Pamph. L.* 1930, *p.* 686. The use of these words in the present statute was evidently intended to safeguard the purity of elections. The word "actual" in Webster's Dictionary means to exist in reality and in fact and is opposed to potential, possible, speculative, hypothetical or theoretical. "Actually" means really, in truth. The words "actually residing" are neither obscure nor ambiguous; it deals with a matter of substance that goes to the very qualification of electors; it not only makes it illegal for any elector to vote elsewhere than in his own district but also makes his right to vote depend upon the exercise of that right within the election district wherein he *actually resides*. This is not a mere statutory warning or monition. It was held in *Lane* v. *Otis,* 68 *N. J. L.* 64; 52 *Atl. Rep.* 305, that this provision is mandatory in character and the effect of a vote illegally cast in disregard of it is that in legal effect no vote has been cast. It was said in the case of *Actor* v. *Merritt,* 111 *U. S.* 213, that the word "actual" has a meaning "real" as opposed to "nominal." See, also, to the same effect the cases of *Baron* v. *Wisnowski,* 102 *N. J. L.* 46; 130 *Atl. Rep.* 450; *Ruhle* v. *Caffrey,* 113 *N. J. L.* 240; 174 *Atl. Rep.* 204. In the case of the *Y. M. C. A.* v. *Orange,* 3 *N. J. Mis. R.* 404; 128 *Atl. Rep.* 580, there was involved the construction of the exemptions that were allowed by the tax laws of the State of New Jersey. An exemption was claimed from taxation because the building taxed was to be used for purposes which, under the statute, granted immunity from taxation. The building taxed was in the course of construction. The law provided that the exemption could be enjoyed on all buildings *actually* and exclusively used in the work of the association.

The tax was sustained as the building was not actually in use. To the same effect is the case of the *Institute of Holy Angels* v. *Fort Lee,* 80 *N. J. L.* 545; 77 *Atl. Rep.* 1035; also *State* v. *Carr,* 117 *N. J. L.* 245 (at *p.* 251); 187 *Atl. Rep.* 350. It should be noticed that *R. S.* 19:4-1 of the Election law provides not only for the actual residence of the elector before he is entitled to vote but it also states that he cannot vote elsewhere. A term that is very often used by voters that results in confusion and the casting of illegal votes is the claim that a voter has a "voting residence." The opinion prevails with not a small number of voters that all they have to do to qualify on the question of residence in order to vote legally is to declare that a certain address is their voting residence. It is not sufficient to comply with the statute on this qualification to merely designate an address as a voting residence, the law requires that the residence of the voter must be real, actual and positive. To be a "voting residence" there must be not only the intention of having the address for the purposes of voting but that intention must be accompanied by acts of living, dwelling, lodging or residing sufficient to reasonably establish that it is the real and actual residence of the voter. If the term "voting residence" fulfills those qualifications then it may be said to be a voting residence. If by voting residence is meant that a voter simply declares that a certain residence is his voting residence and there appears no outward act of living, dwelling, lodging or making the place his actual residence then such "voting residence" does not fulfill the requirements of the law and a person voting in an election district where such "voting residence" is situate cannot legally cast a vote in that district. The voter must not only have the intent of designating a place as his or her residence but such expression of intention must be accompanied by acts in furtherance of that intention and those acts should be actual. The best and most trustworthy evidence of a voter's residence, as a general rule, are his acts rather than his declarations concerning his residence. It is difficult to set a hard and fast rule as to what constitutes actual residence and each case that arises may require indi-

vidual consideration, but this much is certain that the voter must not only exercise an intention of having a place as his residence but that intention must be accompanied and fortified by actual and real acts of residing at the intended residence. A man may have more than one residence; he may live in one place during the summer and another in the winter but as far as voting qualifications required by the State of New Jersey are concerned he can vote only from the place where he *actually resides* in the State of New Jersey *and not elsewhere*. In the early days of our country it was not difficult to determine a person's residence or domicile. Families were raised in a community and seldom moved therefrom even for short periods. A person's residence in those days was clearly indicated and shown by his mode of life and well understood by his neighbor. The complexities of our modern way of life has effected changes in this respect, especially in our large cities with apartment houses and hotels where a person very often does not know his neighbor much less his residence or domocile. In the early days of our country if a citizen of a community was wealthy enough to enjoy the luxury of travel and residences in different parts of the country or if he was elected to public office which public service required him to be away from his home for long periods of time his neighbor had no difficulty in understanding and knowing the domicile and residence of such a citizen, not only by his declared intention but by his conduct in maintaining his home with all the earmarks of readiness for occupancy and every indication that it would be occupied by him on his return. It is common knowledge in the State of New Jersey that we have had citizens who have been blessed with considerable wealth; have been honored by the citizens of the state in being elected to public office that required them to be in Washington for long periods of time. When their legislative duties were over some of them journeyed to shooting lodges in Scotland, summer homes in Maine, winter homes in Florida, but those men retained their actual residence in the State of New Jersey. The actuality of the residence was well known by their neighbors in the community in which they resided. The residence

always bore the earmarks of occupation or readiness for occupation and the neighbors in the community as well as most of the citizens of the state knew that it was the actual residence of the public servant. Those men not only performed their duties as representatives of the State of New Jersey in Congress but also took a strong interest in their community affairs. They took on the burdens of the state and local municipal government. The test, therefore, of actual residence cannot be measured by the period of time that a person resides at a given address, the time may be short or it may be long but whether short or long there must be an intention to reside at the place and that intention must be supported by actual acts of living at the residence to such a degree that they reasonably show that the party intended the residence as his real and actual residence. An interesting illustration that demonstrates the accuracy of this statement as to the time of occupancy is that of George Washington. For a period of over sixteen years from the time he became commander-in-chief of the army of the United States, to the time that he retired from public life he was away from his home most of the time. Notwithstanding this long absence from his residence most every citizen of the country knew that Washington's residence and domicile was at Mount Vernon. This was apparent from his often expressed intention and his conduct in owning and maintaining his home at that place ready at all times for occupancy by him. Then again the renting or ownership of a place is not in and of itself the deciding test of actual residence but it is a factor to be considered in arriving at a decision together with the other factors which are very numerous and include not only the usual activities of actually residing at an address but those civic responsibilities such as jury and military service. Temporary residence occasioned in the pursuit of recreation; in performing the duties of public office; in attending military camps; seats of learning, hospitals and the like are as a rule not actual residences as contemplated by the laws of our state. It is the duty of a citizen of our state to vote at an election, both primary as well as general. It should be his desire to have

an honest election and also to bear the burdens that naturally fall upon a person who actually resides in a community including the payment of taxes, military and jury service, and an interest in local elections. The Election law of our state by requiring an actual residence contributes very much to the accomplishment of those desirable ends. It clearly appears in this case that the voter Joseph Laible in designating 550 Garfield avenue, Jersey City, as his residence and in voting as a resident of that address did so illegally, as it was not his actual residence' and his vote for the candidates Erickson and Gelbke was illegally cast and counted for those candidates and this court so finds and determines. The voter Walter Gunderson in designating 45 Von Nostrand avenue, Jersey City, as his place of residence and in voting as a resident of that address did so illegally, as it was not his actual residence and his vote for the candidates Erickson and Gelbke was illegally cast and counted for these candidates and this court so finds and determines. The voter William Erickson in designating 11 Armstrong avenue, Jersey City, as his place of residence and in voting as a resident of that address did so illegally, as it was not his actual residence and his vote for the candidates Harry Erickson and Elsa Gelbke was illegally cast and counted for those candidates and this court so finds and determines. It was agreed by the parties in this case, and so established as a fact, that the remaining votes cast at the primary election and in the election district aforesaid were legally cast and counted and that these votes should remain as votes for the candidates as shown by the returns of the election officers of said election district. This court finds and determines sufficient illegal votes were received and counted in favor of the candidates Harry Erickson and Elsa Gelbke as to change the result of the election. The court further finds and determines at the primary election held in the fifty-fourth district of the seventh ward of Jersey City, Hudson county, New Jersey, on September 19th, 1939, wherein Harry Erickson and James W. McCarthy, Jr., were the male candidates and Elsa Gelbke and Anita McCarthy were the female candidates for election as members of the Republican

county committee in and for Hudson county that Elsa Gelbke received seventeen votes; Harry Erickson seventeen votes; Anita McCarthy nineteen votes and James W. McCarthy, Jr., twenty votes, and that the last two persons mentioned are entitled to receive each a certificate of election. The judgment of this court is that Harry Erickson and Elsa Gelbke are not entitled to a certificate of election and that James W. McCarthy, Jr., and Anita McCarthy are each entitled to a certificate of election. The certificate of election granted to Elsa Gelbke is declared to be void and of no effect and set aside and for nothing holden.