PASSAIC COUNTY CIRCUIT COURT.

CHARLES SCHWEITZER, CONTESTANT, v. SAMUEL BUSER, SR., INCUMBENT-DEFENDANT.

IN THE MATTER OF THE CONTEST OF THE ELECTION OF SAMUEL BUSER, SR., AS COUNCILMAN OF THE BOROUGH OF NORTH HALEDON, IN THE COUNTY OF PASSAIC.

Decided December 19, 1936.

For the contestant, *William Sheps* and *Samuel Raff*.

For the incumbent-defendant, *Archibald Kreiger*.

WOLBER, C. C. J. The contestant, Charles Schweitzer, on November 16th, 1936, filed his petition with the clerk of the Passaic County Circuit Court which alleged, among other things, that he was on November 3d, 1936, eligible for election to the office of councilman of the borough of North Haledon; that an election for councilman was held in said borough on said November 3d, 1936, and that at said election he received the largest number of votes cast for said office of councilman and was duly elected, and should be declared elected thereto; that the board of canvassers of the county of Passaic declared election as follows: Charles Schweitzer, 534 votes; Samuel Buser, Sr., 609 votes; and declared the said Samuel Buser, Sr., duly elected to said office; that said Samuel Buser, Sr., received the certificate of election from said board of canvassers and is about to take possession of said office and exercise the functions and receive the emoluments thereof.

Said Charles Schweitzer contests the said alleged election of Samuel Buser, Sr., upon the ground that illegal votes were received and cast at the polls for Samuel Buser, Sr., in excess of seventy-five votes, which would be sufficient to change the result of the election. The illegal votes, it is alleged, were cast by persons not being legal residents of the first election district of the borough of North Haledon, and the petition of the contestant contains the names of seventy-six persons, who on November 3d, 1936, were enrolled and living at Camp Haledon, located in said borough of North Haledon. If these seventy-six votes were illegally received, and it is proven that they were cast for the incumbent, the contestant would have been legally elected and entitled to his certificate of election. The incumbent, answering the petition of the contestant, denied the allegations of the petition.

The matter comes before me as a contest of the election of Samuel Buser, Sr., to the office of councilman of the borough of North Haledon by one of two defeated candidates for said public office and is controlled by the provisions of article XXVI of "An act to regulate elections (Revision of 1930, approved April 18th, 1930) with the amendments and supplements thereto." *Pamph. L.* 1930, *ch.* 187, *pp.* 671-829; *Supp. Comp. Stat.* 1925-1930, *pp.* 491-605, §§ 65-1019 to 65-2601 A.

It appears from the testimony taken before me on November 30th and December 1st, 1936, that the borough of Haledon, which owned a tract of land within the confines of the borough of North Haledon, leased the premises to the New Jersey Emergency Relief Administration on October 18th, 1934. The lease is in evidence and covers "all lands adjoining the reservoir and waterworks owned by the borough of Haledon with the exception of that portion used by the water department, to be used exclusively for the following purposes: Transient Training Camp." The lease was for a term beginning November 1st, 1934, and ending with October 31st, 1935.

The temporary state emergency relief administration, in existence at the time of making this lease on October 18th, 1934, was set up under the provisions of chapter 12 of the laws of 1934, page 47 (*N. J. Stat. Annual* 1934, § 161-354),

which became effective on January 31st, 1934, and was to become inoperative after January 31st, 1935.

By chapter 12 of the laws of 1935, page 34, this act was on January 28th, 1935, extended to February 28th, 1935, and a new state emergency relief administration was set up on February 26th, 1935, by chapter 35 of the laws of 1935, page 81 (*N. J. Stat. Annual* 1935, §§ 161-171, 161-173), which shall expire on March 1st, 1938, but shall become inoperative from and after such time as the governor shall, by proclamation, declare that the emergency necessitating its creation had ceased to exist. That act also provided that emergency relief shall continue to be administered under chapter 12 of the laws of 1934, until March 1st, 1935.

On May 4th, 1936, by chapter 83 of the laws of 1936, the emergency relief administration set up under chapter 35 of the laws of 1935, was abolished, and a new public policy declared by the legislature, that public assistance is primarily the duty of the municipality and of civic and charitable organizations.

When chapter 12 of the laws of 1934 was approved on January 31st 1934, the following declaration of a public policy was made by the legislature:

"Whereas, the responsibility for the securing of employment for providing the necessities of life is primarily individual and the result of private effort and industry, and while the providing of relief of various kinds so far as it must be done out of public funds is the responsibility and function of local governments, by reason of the widespread unemployment resulting from existing economic and industrial conditions, relief and assistance that can be provided by private agencies and local governing authorities are not presently sufficient to meet the minimum needs of the people of this state, it therefore becoming necessary to supplement the local public and private relief work by state aid and support; and

"Whereas, the hardships occasioned by and attendant upon the lack of gainful employment and the economic depression generally prevailing are so acute and so affect the public health and welfare of the people that there is now an emergency which requires state recognition and aid; * * *."

Supplementing the legislation providing for relief of various kinds, the legislature has provided by successive enactments during the period of the present economic emergency, beginning October 13th, 1931, until January 31st, 1938, that dependency or poor relief received by any person, resident of this state, from any of the poor or emergency relief agencies of this state or of the several municipalities thereof, shall not be counted in computing the residence or domiciliary period necessary for any such person to either gain or lose a place of legal settlement under any law of this state, to the end that the place of legal settlement of any person receiving dependency or poor relief shall be and remain the same during this emergency. *Pamph. L.* 1933, *ch.* 126, *p.* 263; *N. J. Stat. Annual* 1933, § 161-163; *Pamph. L.* 1934, *ch.* 9, *p.* 45; *N. J. Stat. Annual* 1934, § 161-163; *Pamph. L.* 1935, *ch.* 260, *p.* 840; *N. J. Stat. Annual* 1935, § 161-401.

There is testimony in this case that the property was used by the New Jersey temporary emergency relief administration for a transient training camp as early as August 15th, 1933. That temporary administration was set up under the provisions of chapter 4 of the laws of 1933, amending chapter 394 of the laws of 1931.

It is undisputed that on December 2d, 1935, the New Jersey state relief administration turned over this camp to the federal government, and it then became a part of the federal works progress administration established under the "Emergency Relief Appropriation Act of 1935 (Public Resolution No. 11, Seventy-fourth Congress)" and executive order No. 7034 of May 6th, 1935. The purpose of public resolution No. 11 is stated as follows: "That in order to provide relief, work relief and to increase employment by providing for useful projects, there is hereby appropriated, * * *."

I do not find that any rules and regulations prescribed by the works progress administration, "a. to assure that as many of the persons employed on all works projects as is feasible shall be persons receiving relief; and b. to govern the selection of such persons for such employment," were approved by the president of the United States as required by his executive order of May 6th, 1935.

The evidence shows that on November 3d, 1936, the seventy-six persons whose votes were challenged resided at Camp Haledon; that they received their compensation from the federal government and paid the federal government for their keep and maintenance. Seventy-two of the seventy-six persons had previous residence in seventeen states of the union; thirty-three of them had resided in New Jersey and thirty-nine hailed from Massachusetts and Rhode Island; as far south as Louisiana, Texas and Florida; and as far west as Montana. Their ages ranged from twenty-one years to seventy-five years, and the earliest entrant of the camp has been there since October 1st, 1933. Ten had previous residences in Passaic county; twenty-three in other counties of the state; four came from other camps within the state; and two from camps outside of the state.

Paragraph 37 of article IV of the New Jersey Election law, Revision of 1930 (*Supp. Comp. Stat.* 1925, *p.* 502, § 65-4), prescribes the following qualifications for exercising the right of franchise:

"Every person possessing the qualifications required by the Nineteenth Amendment to the Constitution of the United States [woman suffrage] and Article II, Section 1 of the Constitution of the State of New Jersey and having none of the disqualifications mentions [*sic*] therein, and being duly registered as required by this act, shall be entitled to vote in the polling place assigned to the election district in which *he actually resides,* and not elsewhere; provided  *  *  *."

Section 1 of article II of the New Jersey Constitution provides as follows:

"1. Every male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this State one year, and of the county in which he claims his vote five months, next before the election, shall be entitled to vote for all officers that are now, or hereafter may be elective by the people; *provided,* that no person in the military, naval, or marine service of the United States shall be considered a resident in this State, by being stationed in any garrison, barrack, or military or naval place or station within this State; and no pauper, idiot, insane person, or person con-

victed of a crime which now excludes him from being a witness unless pardoned or restored by law to the right of suffrage, shall enjoy the right of an elector; *and provided further* * * *."

While Camp Haledon was a camp in the State of New Jersey on the last general election day under the jurisdiction of the federal works progress administration, the enrollees in the camp were not in the military, naval or marine service of the United States, and, therefore, none of the seventy-six persons whose votes are questioned in this proceeding possessed the disqualification of federal service mentioned in the state constitution.

None of the camp enrollees were residents of the first election district of the borough of North Haledon prior to their residence in the camp. Three had voted in prior elections in other places in New Jersey and none had voted in North Haledon previously. The only question before the court is whether or not the seventy-six persons whose right to vote is questioned actually resided in the first election district of the borough of North Haledon on the last general election day. There is no question in the case that these persons were registered as required by law (paragraph 170 of article XIV of the Election law, Revision of 1930), and that each person, when his vote was challenged, took the statutory oath of qualification as required by paragraph 184 of the same article.

Three non-residents of New Jersey who were admitted to the camp on November 11th, 1935, December 29th, 1935, and February 6th, 1936, respectively, failed to meet the requirement of one year's residence in the state, and were not legally entitled to vote at the general election on November 3d, 1936.

It also appears in this case that all of these persons were unattached and without families, with a single exception. It must be conceded that Camp Haledon was not the domicile of origin of any of these persons whose vote was questioned.

In the case of *Harral* v. *Harral (Court of Errors and Appeals, 1884), 39 N. J. Eq.* 279, which was a case involving a community of property between a husband and wife as an incident of the marriage, under the laws of France, Mr. Justice Depue (at *p.* 285) said:

"A person *sui juris* may change his domicile as often as he pleases. * * * There must be a voluntary change of residence; the residence at the place chosen for the domicile must be actual; to the *factum* of residence there must be added the *animus manendi* [intention of remaining]; and that place is the domicile of a person in which he has voluntarily fixed his habitation, not for a mere temporary or special purpose, but with a present intention of making it his home, unless or until something which is uncertain or unexpected shall happen to induce him to adopt some other permanent home."

In this case we have a transient training camp converted into a works progress administration camp, designed to furnish sustenance and shelter to American citizens during a period of unemployment emergency. The emergency phase of the works progress administration has been to provide the able-bodied unemployed with jobs at security wages. How can it be said, in view of the consistent public policy of providing relief until economic recovery, declared by state and nation, that these persons made the camp their actual residence which would entitle them to the rights of electors in the first election district of the borough of North Haledon at the last general election?

We have here a residence in fact, but where can it be spelled out from the record that any of these persons had by any outward acts indicated an intention to make a home in fact at the temporary relief camp? The intention required for the acquisition of a domicile is an intention to make a home in fact, and not an intention to acquire a domicile. *Am. Law Inst. Restatement, Conflict of Laws,* § 21.

In *Williamson* v. *Osenton,* 232 *U. S.* 619, the United States Supreme Court says:

"'The essential fact that raises a change of abode to a change of domicile is the absence of any intention to live elsewhere (*Story Confl. L.,* § 43); or as Mr. Dicey puts it in his admirable work: 'the absence of any present intention of not residing permanently or indefinitely in the new abode. *Conflict of Laws* (2d ed.), III.' "

When the present emergency clears up, there will be an end to the necessity of this camp for relief purposes. The present

policy of the federal government is to speed up economic recovery so that private industry will absorb our unemployed as speedily as possible, and nearly all of these enrollees should soon be back to work in private industry at some other place.

Vice-Ordinary Buchanan in the case of *In re Dorrance* (*Prerogative Court*, 1934), 115 *N. J. Eq.* 268; 170 *Atl. Rep.* 601; *affirmed* (*Supreme Court*, 1935, *per curiam*), 13 *N. J. Mis. R.* 168; 176 *Atl. Rep.* 902; *affirmed*, (*Court of Errors and Appeals*, 1936), 116 *N. J. L.* 362; 184 *Atl. Rep.* 743, *per curiam* on *per curiam* opinion of Supreme Court (at *p.* 274), says:

"There are certain fundamental principles of the law of domicile, so thoroughly established everywhere as to be frequently called 'axiomatic.' Among them are the following:

"1. When a man has acquired a domicile in a particular place, that place remains his domicile until he acquires another domicile.

"2. To effectuate such a change of domicile it is requisite that he shall in fact remove from the old domicile to the new, with the intention of abandoning the old domicile and of remaining permanently or indefinitely in the new.

"3. The burden of proof to establish that a change of domicile has occurred rests upon the party so asserting.

"4. A man has the right to choose his own domicile, and his motive in such choice is immaterial."

Mere taking up residence is not sufficient, unless there be an intention to abandon a former domicile. *Bradley* v. *Lowry, Speers Eq.* (*S. C.*) 1; 39 *Am. Dec.* 142; 6 *M. & W.* 511; *Inhabitants of Wayne* v. *Inhabitants of Greene*, 21 *Me.* 357; *Putnam* v. *Johnson*, 10 *Mass.* 488; 1 *Curt. Eccl.* 856; *People* v. *Peralta*, 4 *Cal.* 175; *Bartlett* v. *City of New York*, 5 *Sandf.* (*N. Y.*) 44; *Price* v. *Price*, 156 *Pa.* 617; 27 *Atl. Rep.* 291; *State* v. *Dayton*, 77 *Mo.* 678; nor is it even *prima facie* evidence of domicile when the nature of the residence either is inconsistent with, or rebuts the presumption of the existence of an *animus manendi*. *Dicey Dom. Rule* 19; 34 *L. J. Ch.* 212. Nor is intention alone of constituting domicile sufficient, unless accompanied by some acts in furtherance of such intention. *Chaine* v. *Wilson*, 1 *Bosw.* (*N. Y.*) 673; *Ring-*

*gold* v. *Barley,* 5 *Md.* 186; 59 *Am. Dec.* 107; *Wright* v. *Boston,* 126 *Mass.* 161; *Carey's Appeal,* 75 *Pa.* 201; *Morris* v. *Gilmer,* 129 *U. S.* 328; 9 *Sup. Ct.* 289; 32 *L. Ed.* 690.

Mr. Justice Vroom, in *Walkinson* v. *Watkinson* (*Court of Errors and Appeals,* 1904), 68 *N. J. Eq.* 632; 60 *Atl. Rep.* 931, a case in which it was sought to set aside a divorce decree (at *p.* 638), approved the rule as to domicile set forth by Mr. Justice Depue in *Harral* v. *Harral, supra,* and further said:

"The doctrine laid down by the courts of the United States is that a domicile having been once acquired, continues until a new one is actually acquired *animo et facto.* 10 *Am. & Eng. Encycl. L.* 15; *Cadwalader* v. *Howell,* 18 *N. J. L.* 138; *Clark* ads. *Likens,* 26 *Id.* 207."

Judge Donges, now Mr. Justice, in *Snyder* v. *Callahan* (*Ocean County Circuit Court,* 1925), 3 *N. J. Mis. R.* 269, said (at *p.* 272):

"And while, in determining the *animus manendi,* the declarations of the claimant are material and important yet, as was said by Vice-Chancellor Van Fleet in *Firth* v. *Firth* (*Court of Chancery,* 1892), 50 *N. J. Eq.* 137: 'the best and most trustworthy evidence of it is to be found as a general rule in his acts rather than in his declarations.' "

The instant case is bare of any facts to show a change of residence outside of the attendance at Camp Haledon of the persons whose votes are challenged in this proceeding. In the acquistion of a new domicile, more is required than a mere change of residence; there must be a fixed intention to renounce a birthright in the place of the original domicile and to adopt the political and municipal status involved by permanent residence of choice elsewhere. A student does not change his domicile by residence at college. *In the Matter of Goodman,* 146 *N. Y.* 284, Judge Finch. This case was cited and approved in *In re Matter of Garvey,* 147 *Id.* 117.

My worthy predecessor, the late Judge Mackay, in the case of *Brueckmann* v. *Frignoca,* 9 *N. J. Mis. R.* 128; 152 *Atl. Rep.* 580, held that the inmates of a sanitorium or hospital were not entitled to vote in Haledon at a General Election for a municipal office.

As to the right of sojourners, laborers and railway workers to vote, see 6 *Am. & Eng. Encycl. L.* (*1st ed.*) 277, and the cases of *Barnes* v. *Adams* (3 *Congressional Election Cases* 711), and *Cessna* v. *Meyers* (*Congressional Election Cases,* February 7, 1872).

Mr. Justice Close, in a recent case in the New York Supreme Court for Westchester county, October 26th, 1936, denied the right of prospective voters employed in the national park service and living at a camp to vote in the camp election district.

I have, therefore concluded that these seventy-six persons were not qualified to vote in the first election district of the borough of North Haledon on November 3d, 1936, and I will, therefore, fix next Tuesday morning, the twenty-second instant, at the court house in Paterson, New Jersey, for a continuation of the hearing on the petition of the contestant herein, in order to determine whether or not the seventy-six illegal votes cast at the last general election for the office of councilman of the borough of North Haledon in the county of Passaic are sufficient to change the result of said election as between the contestant and incumbent, in accordance with the statute.