THOMAS WORDEN *ET AL.*, PLAINTIFFS-RESPONDENTS, v. MERCER COUNTY BOARD OF ELECTIONS, DEFENDANT-APPELLANT.

Argued May 8 and 9, 1972—Decided July 14, 1972.

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for defendant-appellant (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Mr. Robert Wills,* Deputy Attorney General, on the brief).

*Mr. Gerald R. Stockman* argued the cause for plaintiffs-respondents (*Messrs. Dietrich and Stockman,* attorneys; *Mr. Michael J. Herbert* and *Mr. Marshall Lichtenstein,* for Student Vote, Inc., on the brief).

The opinion of the Court was delivered by

JACOBS, J. The Law Division found that college students who reside at their colleges within Mercer County have been discriminated against by local election officials and it adjudged that such students, with the exception of those who plan to return to the residences they had before entering college, are entitled to be registered as voters in Mercer County. Considering itself aggrieved by the Law Division's judgment, the Mercer County Board of Elections appealed to the Appellate Division and we certified before argument there.

The plaintiff Thomas Worden testified that he resides in Mercer County on the campus at Trenton State College. He was in his first year and intended to continue his residence in Mercer County until he finished his college course. After college he hoped to obtain a "job teaching someplace" and that "could be anywhere." His parents reside in Somerset County and they have "a bed there" for him whenever he returns. They do not pay his "tuition or room and board" at college. He has not sought to register to vote in Somerset County but on September 14, 1971 he sought to register at the Office of the Clerk of Ewing Township in which his college residence is located. He filled out the customary form and was about to sign it when he was told that since he was a college student residing on campus he could not be registered but he could, if he wished, go down to the courthouse where the Mercer County Board of Elections was located. He telephoned the County Board but he did not appear personally and was not registered.

The plaintiff Linda Cooper is a graduate student at Princeton University and resides on campus. She has a fellowship which provides tuition plus a substantial living

stipend. She is a candidate for a Ph.D. degree, plans to remain at Princeton for the time required to obtain it, and is uncertain as to her plans thereafter. She testified that she considers her Princeton quarters to be her home and that she intends to reside there indefinitely. Her parents live in the Borough of Ramsey and they have facilities for her to sleep overnight. She visits them "at Christmastime" and whenever else she sees fit. She has never registered to vote in Ramsey but on September 20, 1971 she sought to register at the Princeton Borough Hall. She told the clerk that her "permanent residence was the Graduate College" and that she had an adequate fellowship which she considered the equivalent of earning her own keep. In turn she was told that since she was a student living on campus she had "a home address" with her parents and that she was not eligible to vote in the Borough where her college residence was located.

The plaintiff Lawrence Crane is a Princeton graduate student who has continuously resided on campus since 1967. He is now twenty-six and, although he has heretofore considered New York to be his home, he now wishes to change his home to Princeton, New Jersey, where he actually resides. He spends the bulk of his time in the Princeton area, most of his clothing is there, he has a New Jersey driver's license, and he plans to remain in Princeton at least until his formal education is completed. Thereafter his plans are uncertain although it is possible that he will remain in Princeton. His interests are largely in the Princeton area rather than in New York and, as he is "more familiar with the events in New Jersey" than with the events in the New York voting district, he wishes to vote in New Jersey. When he attempted to register to vote at the Princeton Borough Hall he was told that since he was a student living on campus he could not register in Mercer County.

Mr. John A. Garzio testified that he has been Clerk of Ewing Township for eleven years; during that period there was no instance, so far as he could recall, where he had

permitted registration by a student whose parents lived outside New Jersey. He normally asks applicants for voting registration only routine questions relating to age, citizenship, duration of residence, etc.; however, if they are students they are subjected to much more extensive inquiry and are generally referred to the County Board of Elections. Indeed, students who sought to register prior to the November 1971 election were given written notices which flatly stated that "Students registering at Trenton State College cannot register to vote in Ewing Township" and that if they had "any questions concerning this" they should call the Mercer County Board of Elections.

Mr. Robert F. Mooney testified that he was Clerk of the Borough of Princeton and had held that office for twenty-five years. The "basic precept" as he saw it and as he had consistently administered it through his office was that the university student is only a temporary resident and is "therefore not eligible to vote in the State of New Jersey." He stated that through the years he had made rare exceptions as, e. g., when confronted by students who were "orphans" and had "no home to go to." In response to an inquiry as to whether students who seek to register are treated differently than all others who come to his office to register he said "I would say yes, we do treat them differently." As he described it, he and his assistants would register ordinary applicants when they satisfactorily answered the few routine questions but when they dealt with students they would refer back to instructions from the Mercer County Board of Elections and to "an opinion by a Mercer County Counsel dating back to 1927 which in essence says that students here for educational purposes are not bona fide residents of the state." He said that although he would not register students who lived on campus he would register nurses who lived in nurses' quarters adjacent to the Princeton Hospital; and he would also register university instructors without inquiry beyond the routine questions though he recognized that they were "a very mobile section of the community."

Miss Bianchini testified that she is employed in the Office of the Clerk of Lawrence Township where Rider College is now located. Her instructions from the Clerk were that college students were not to be registered but were to be sent to the Mercer County Board of Elections. Mrs. Szabo testified that she has been a member of the defendant Mercer County Board of Elections since 1968 and she indicated that the Board would not permit the registration of any college student who lived on campus unless he could affirmatively establish an independent Mercer County domicil apart from his campus residence. She placed reliance on the 1927 opinion by the Mercer County Counsel and said that she would refuse to register a dormitory student even though he made a convincing showing as to his interest and understanding of local issues and as to his firm purpose of remaining in Mercer County after his dormitory residence was terminated. She stated that, so far as she knew, no student who was a campus resident in Mercer County had ever been permitted to register and that she was "not about to change any policy in the office at this time." She acknowledged that the ordinary applicant for registration would be asked only the few routine questions but that students would be asked many more questions. One of the additional questions addressed to the student would relate to his address on his application for admission to college; as to that she testified that "if the answer in the address is not in Mercer County, this person cannot be registered."

There was additional testimony but no purpose would be served by recounting it here. At the close of all of the testimony Judge Kingfield, sitting in the Law Division, rendered his oral conclusions. He pointed out that a person seeking to register to vote in this State "must be a bona fide resident for a specified time prior to registration" but that the residence thereafter need not be for any fixed time but may be "for an indefinite period," and that the resident may come to the community "for a short period of time and then move on" as, *e. g.,* the clergyman who has never "been denied

the right to register to vote" in the community while he remained there. He classified resident students into four groupings, namely, (1) those who plan to return to their previous residences, (2) those who plan to remain permanently in their college communities, (3) those who plan to obtain employment away from their previous residences, and (4) those who are uncertain as to their future plans. He ruled that students in the latter three categories should be permitted to vote at their college residences and made the finding that "college students in Mercer County, have as a class been discriminated against in violation of the Equal Protection Clause of the United States Constitution." He enjoined the Mercer County Board of Elections, along with the Clerks of Ewing Township, Princeton Borough and Lawrence Township, from "interfering with or denying to college students the right to register to vote from their college address," provided they otherwise comply with the voting requirements and provided further that "the only test concerning their bona fide residence shall be, what their intent is with regard to their former place of residence (prior to arrival at school)." He directed that students in the first category shall be deemed ineligible to register from their school residences but that students in the latter three categories "shall be registered forthwith."

The plaintiffs have not appealed from that portion of Judge Kingfield's judgment which precluded students in the first category from voting at their college residences; since the judgment in effect granted broad relief to most though not all of the resident students, the plaintiffs apparently were content to let the matter rest. However, the Mercer County Board of Elections has appealed from the whole of the judgment and the Attorney General has filed a brief on its behalf urging that the judgment be reversed. The Attorney General's position is that "there should be no significant departure from existing New Jersey law with respect to the voting residence of students" and he cites the New Jersey precedents including *Cadwalader v. Howell*

*and Moore,* 18 *N. J. L.* 138, 146 (*Sup. Ct.* 1840) ; *Schweitzer v. Buser,* 15 *N. J. Misc.* 217, 225 (*Cir. Ct.* 1936) ; *State v. Benny,* 20 *N. J.* 238 (1955) ; *Perri v. Kisselbach,* 34 *N. J.* 84 (1961) ; *Michaud v. Yeomans,* 115 *N. J. Super.* 200 (*Law Div.* 1971). In *Cadwalader,* decided in 1840, the court construed the statutory residence requirement in the election law to mean "domicil" which the common law viewed as one's fixed or permanent home to which, whenever temporarily absent, he has the intention of returning. 18 *N. J. L.* at 144. Commenting on students, the court noted that they "are considered in law, as *residing* at their original homes, although in point of fact, they may be *living* for the time being, elsewhere." 18 *N. J. L.* at 146. In *Schweitzer,* decided in 1936, the court took the same approach, viewing his parents' home as the student's domicil and stating flatly that "a student does not change his domicile by residence at college." 15 *N. J. Misc.* at 225 ; see also *In re McCarthy,* 18 *N. J. Misc.* 5, 16 (*Cir. Ct.* 1939).

These statements were made in relatively immobile eras when it was generally assumed that the college student would lead a semicloistered life with little or no interest in noncollege community affairs and with the intent of returning, on graduation, to his parents' home and way of living. Such assumption of course has no current validity. See Singer, "Student Power at the Polls," 31 *Ohio St. L. J.* 703, 714 (1970) ; Guido, "Student Voting and Residency Qualifications: The Aftermath of the Twenty-Sixth Amendment," 47 *N. Y. U. L. Rev.* 32, 36 (1972). And so much of pertinence and importance has recently happened elsewhere, constitutionally, legislatively and judicially, that its bearing on the continued vitality of the New Jersey precedents must be dealt with here. See *U. S. Const.* amend. XXVI; 42 *U. S. C. A.* § 1973bb (1970) ; 42 *U. S. C. A.* § 1971(a)(2)(A) (1970) ; *Dunn v. Blumstein,* 405 *U. S.* 330, 92 S. Ct. 995, 31 *L. Ed.* 2d 274 (1972) ; *Jolicoeur v. Mihaly,* 5 *Cal.* 3d 565, 488 *P.* 2d 1, 96 *Cal. Rptr.* 697 (1971) ; *Wilkins v. Bentley,* 385 *Mich.* 670, 189 *N. W.* 2d

423 (1971); see also *Annot.*, 44 *A. L. R. 3d* 797 (1972); Note, 60 *Calif. L. Rev.* 806 (1972); *Comment*, 70 *Mich. L. Rev.* 920 (1972); Note, 72 *Colum. L. Rev.* 162 (1972); Recent Developments, 60 *Geo. L. J.* 1115 (1972); Note, 5 *Ind. L. F.* 385 (1972); Comment, 6 *Suffolk L. Rev.* 646 (1972).

The Civil Rights Act of 1964, as amended, provides that in determining whether any individual is qualified under state law or laws to vote in any election, the officials shall not apply "any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals." 42 *U. S. C. A.* § 1971(a)(2)(A). Though it has generally been dealt with in racial contexts its sweeping terminology suggests application to discriminations in student and other nonracial contexts. See Guido, *supra,* 47 *N. Y. U. L. Rev.* at 53–57. The Voting Rights Act of 1970, which was designed to encourage younger voting participation by lowering the voting age to eighteen in all elections, was limited to federal elections by *Oregon v. Mitchell,* 400 *U. S.* 112, 91 S. Ct. 260, 27 *L. Ed. 2d* 272 (1970), but was quickly followed by the twenty-sixth amendment which provides that the right of citizens who are eighteen or over to vote shall not be "denied or abridged" by the United States or by any state "on account of age." *U. S. Const.* amend. XXVI.

The legislative history preceding the adoption of the amendment clearly evidences the purpose not only of. extending the voting right to younger voters but also of encouraging their participation by the elimination of all unnecessary burdens and barriers. Thus the Senate Report (S. Rep. No. 26, 92d Cong., 1st Sess. (1971)), specifically noted (at 14) that "forcing young voters to undertake special burdens — obtaining absentee ballots, or traveling to one centralized location in each city, for example —. in order to exercise their right to vote might well serve to dissuade them from participating in the election.. This result, and the election procedures that create it, are at least in-

consistent with the purpose of the Voting Rights Act, which sought to encourage greater political participation on the part of the young; such segregation might even amount to a denial of their 14th Amendment right to equal protection of the laws in the exercise of the franchise." It is significant that the twenty-sixth amendment prohibited not only denial but also abridgment of the voting rights granted to the younger voters, many of whom as the congressional and legislative members well know, would be resident in their college communities at election time. See Guido, *supra,* 47 *N. Y. U. L. Rev.* at 41–44; Note, 60 *Calif. L. Rev., supra,* at 807–808; Note, 60 *Geo. L. J., supra* at 1116–1117.

The Senate Report's suggestion that denial of the young voters' right to vote at their college residences may run counter to the equal protection clause finds a significant measure of support in the recent Supreme Court cases which indicate that, since the right to vote is a very fundamental one, restrictions thereon may be imposed only to the extent necessary to promote "a compelling state interest." See *Dunn v. Blumstein, supra,* 405 *U. S.* 330, 92 S. Ct. 995, 31 L. Ed. 2d 274; *Evans v. Cornman,* 398 *U. S.* 419, 90 S. Ct. 1752, 26 *L. Ed. 2d* 370 (1970); *Phoenix v. Kolodziejski,* 399 *U. S.* 204, 90 S. Ct. 1990, 26 *L. Ed. 2d* 523 (1970); *Kramer v. Union Free School Dist.,* 395 *U. S.* 621, 89 S. Ct. 1886, 23 *L. Ed. 2d* 583 (1969); *Cipriano v. Houma,* 395 *U. S.* 701, 89 S. Ct. 1897, 23 *L. Ed. 2d* 647 (1969); *Carrington v. Rash,* 380 *U. S.* 89, 85 S. Ct. 775, 13 *L. Ed. 2d* 675 (1965). In applying the compelling state interest test the Court has stricken various state efforts which sought to impose restrictions beyond ordinary residence requirements and has done so in full opinions which express broad principles bearing analogously on the basic issue before us.

Thus *Carrington* dealt with a Texas constitutional provision which prohibited any member of the Armed Forces who moved to Texas during the course of his military duty from voting in any election in Texas so long as he remained a member of the Armed Forces. Texas sought to justify this

provision as a protection against a "takeover" by military personnel residing at bases near Texas towns but the Court rejected this, holding that so long as the servicemen were "in fact residents," with the intention of making Texas their home indefinitely, they had the constitutional right to an equal opportunity for political representation and could not be "fenced out" because of the way they might vote. 380 *U. S.* at 93–94, 85 S. Ct. at 778–779, 13 *L. Ed. 2d* at 679. The Court also rejected an additional justification advanced by Texas and grounded on the "transient nature" of service in the Armed Forces; here the Court pointed out that, although other types of so-called transients were permitted to show that they were bona fide residents, no such showing by servicemen was permitted. 380 *U. S.* at 94–97, 85 S. Ct. at 779–780, 13 *L. Ed. 2d* at 679–80.

In *Kramer* New York restricted school elections in certain districts to voters who were owners or lessees of taxable real property or parents of children attending school. It sought to justify its restriction by advancing a state interest in confining school elections to members of the community who are "primarily interested in such elections." 395 *U. S.* at 630–631, 89 S. Ct. at 1891, 23 *L. Ed. 2d* at 591. Without passing on whether such classification would be constitutionally permissible, the Court found that the provisions of New York's law could not stand since they permit "inclusion of many persons who have, at best, a remote and indirect interest, in school affairs and, on the other hand, exclude others who have a distinct and direct interest in the school meeting decisions." 395 *U. S.* at 632, 89 S. Ct. at 1892, 23 *L. Ed. 2d* at 592–593. In the course of its opinion the Court stressed that, since the right of franchise was involved, the issue was not simply whether there was a rational basis for the legislative judgment; a more exacting standard obtained, namely, was there "a compelling state interest to justify denying the franchise to appellant and members of his class." 395 *U. S.* at 633, 89 S. Ct. at 1893, 23 *L. Ed. 2d* at 593.

In *Evans* Maryland sought to deny voting rights to persons who lived on the grounds of the National Institutes of Health, a federal enclave within the state's borders. Maryland contended that since those living at the enclave were exempt from various state laws they lacked any substantial interest in the state's electoral decisions. The Court rejected this contention and held that denying them the right to vote would violate the equal protection clause of the Federal Constitution. 398 *U. S.* at 421–426, 90 S. Ct. at 1756, 26 *L. Ed. 2d* at 374–377. Though the residents of the enclave were free of some state laws they would be affected by others and would be concerned with many state electoral decisons; they had a stake and, as the Court put it, they were entitled under the fourteenth amendment "to protect that stake by exercising the equal right to vote." 398 *U. S.* at 426, 90 S. Ct. at 1756, 26 *L. Ed. 2d* at 377.

In *Dunn* the Court recently furthered the principles expressed in the cited decisions and struck Tennessee's one year durational residence requirement as unconstitutional.[1] The state contended that the durational requirement served to protect against fraudulent voting and to further the goal of having "knowledgeable voters" who would be more likely to exercise their rights "more intelligently." The Court considered that the state's registration and criminal laws furnished adequate protection against fraudulent voting, and found it "impossible to believe that durational residence

---

[1]We are not here concerned with the validity of New Jersey's durational requirement since the issue has not been raised and it is assumed that the plaintiffs have satisfied it. In the light of *Dunn* (405 *U. S.* 330, 92 *S. Ct.* 995, 31 *L. Ed. 2d* 274 (1972)) and the thirty-day provision applicable to presidential elections under the Voting Rights Act of 1970 (42 *U. S. C. A.* § 1973aa–1(d)), it has been proposed that Article II, paragraph 3 of New Jersey's Constitution be amended to reduce its six months' residence requirement within the State to thirty days and to reduce its requirement of forty days' residence within the county to thirty days. Assembly Concurrent Resolution No. 74 initiating such amendment was introduced on April 6, 1972, and is now before the Assembly Judiciary Committee.

requirements are necessary to meet the State's goal of stopping fraud." 405 *U. S.* at 354, 92 S. Ct. at 1009, 31 *L. Ed. 2d* at 291. As to the avowed goal of having knowledgeable and intelligent voters, the Court noted that Tennessee may have been impermissibly seeking a long residence requirement in order to deprive new residents with perhaps different outlooks of "their chance to influence the electoral vote of their new home State." 405 *U. S.* at 355–356, 92 S. Ct. at 1010, 31 *L. Ed. 2d* at 292. It suggested that the state may have been revealing this impermissible purpose when it urged in its brief that the extension of the voting privilege to eighteen year olds increased the need for durational residency requirements since there are political subdivisions "wherein there are colleges, universities and military installations with sufficient student body or military personnel over eighteen years of age, as would completely dominate elections in the district, county or municipality so located." 405 *U. S.* at 356 n. 28, 92 S. Ct. at 1010, 31 *L. Ed. 2d* at 292 n. 28.

This specter of a "takeover" was rejected in *Carrington, supra,* 380 *U. S.* 89, 85 S. Ct. 775, 13 *L. Ed. 2d* 675, was referred to as "more theoretical than real" in *Jolicoeur v. Mihaly, supra,* 488 *P. 2d* at 8 n. 7, and as "largely unfounded" in *Wilkins v. Bentley, supra,* 189 *N. W. 2d* at 433. Many college towns have already adopted the practice of honoring requests for local registration by students who assert bona fide residences at their colleges; all indications point to the absence of any adverse effects or any consequences incompatible with modern democratic principles. See Note, "Restrictions On Student Voting," 4 *U. Mich. J. L. Reform* 215, 236 (1970) : "Even apart from the constitutional question, the possibility of student bloc voting has not been proven where a college community actually facilitated student voting. A recent American Council on Education survey of college freshmen showing that forty-four per cent considered themselves liberal and twenty per cent moderate conservative demonstrates that students would not vote as

a solid unit but in fact fairly approximate the voting pat-
terns of the national electorate"; see also Note, 55 *Iowa L.*
*Rev.* 616, 634 (1970), where the author points out that in
1967 the Iowa City Council adopted the practice of not
challenging students who seek to register, that as a result
University of Iowa students were eligible to vote in both
national and local elections, and that there has been no
"proven harmful effects on the community from freely allow-
ing the students to vote"; *cf. Jolicoeur, supra,* 488 *P. 2d*
at 8 n. 7; *Wilkins, supra,* 189 *N. W. 2d* at 433.[2]

In *Jolicoeur* unmarried minors who had residences at
colleges or elsewhere away from their parents' residences
sought to register at their own residences but were not
permitted to do so. They brought a proceeding which cul-
minated in a California Supreme Court decision in their
favor. In the course of his opinion for the court Justice
Peters stressed the history antecedent to the passage of the
twenty-sixth amendment and its indication that "Congress
believed both that minor voters are entitled to be treated
as adults for voting purposes and that voting in the youth's
actual place of residence is essential to accomplishing a pri-
mary congressional goal of channelling youthful idealism
through the political process." 488 *P. 2d* at 5. Elsewhere
in his opinion he noted that "fears of the way minors may
vote or of their impermanency in the community may not be
used to justify special presumptions — conclusive or other-
wise — that they are not bona fide residents of the com-
munity in which they live." 488 *P. 2d* at 4. And finally
he pointed out that while any citizen may be questioned as
to his "true domicile," the man who gets a new job and

---

[2]In July 1971 the Attorney General of Massachusetts ruled, as
have many other Attorneys General, that students otherwise eligible
could vote from their college residences; in January 1972 the Wor-
cester Telegram, in reporting on the consequences of the ruling, noted
that "the 'take-over' of the Town of Amherst by its more than
20,000 college students hasn't happened." Items of comparable
import have appeared in newspapers throughout the country.

moves and the youth who goes to college and moves "must be treated equally" with no special questions as to the validity of the affiant's claim of domicil because of his "age or occupational status." 488 *P. 2d* at 12. See *Bright v. Baesler,* 336 *F. Supp.* 527 (*E. D. Ky.* 1971); *Anderson v. Brown,* 332 *F. Supp.* 1195 (*S. D. Ohio* 1971).

In *Wilkins* several University of Michigan students sought to register to vote in Ann Arbor but were not permitted to do so. Though they had living quarters in their university town, the lower court held that they had not established bona fide residences in Ann Arbor within the contemplation of Michigan's election laws. 24 *Mich. App.* 422, 180 *N. W. 2d* 395 (1970). This holding was reversed by the Michigan Supreme Court in an opinion which expressed strong constitutional support for the right of students to vote at their college residences. 385 *Mich.* 670, 189 *N. W. 2d* 423 (1971). Pointing out that there were no fixed standards and that in some communities, such as Detroit where Wayne State University and other colleges were located, no special questions were asked of student registrants whereas in others, such as Ann Arbor, special questions were asked, the court found that this left too much to the whim or impulse of the individual registrar and violated due process. 189 *N. W. 2d* at 426–427; *cf. Louisiana v. United States,* 380 *U. S.* 145, 153, 85 S. Ct. 817, 13 *L. Ed. 2d* 709, 714 (1965). However, since this was an infirmity which could readily be corrected by administrative guidelines, the court turned quickly to the plaintiffs' contention, which it then proceeded to sustain, that Michigan's rebuttable presumption that a student is not resident within his college community violated the equal protection clause of the Constitution.

The court in *Wilkins* pursued the compelling state interest test which it found in *Kramer, supra,* 395 *U. S.* 621, 89 S. Ct. 1886, 23 *L. Ed. 2d* 583, *Evans, supra,* 398 *U. S.* 419, 90 S. Ct. 1752, 26 *L. Ed. 2d* 370 and other Supreme Court cases. It recognized the state's interest in protecting

against fraud but could find no need in this regard for restraints against students voting at their college residences; there was no suggestion of dual voting since the students sought to vote at their college residences rather than at the residences of their parents and the Michigan laws contained ample provisions in its registration and criminal laws to protect against fraudulent voting. 189 *N. W. 2d* at 430; cf. *Dunn v. Blumstein, supra,* 405 *U. S.* at 353–354, 92 S. Ct. at 1008–1009, 31 *L. Ed. 2d* at 291. It also recognized the state's interest in promoting "a concerned and interested electorate" but readily found the students to have sufficient interests in the communities where their actual college residences are located; thus they are subject to both state and local regulations, they pay sales and gasoline and such other taxes as are applicable (189 *N. W. 2d* at 431), they are no more mobile than other classes of transients who become short-term residents and then move on but whose right to vote while they are residents is never questioned (Guido, *supra,* 47 *N. Y. U. L. Rev.* at 50; *Singer, supra,* 31 *Ohio St. L. J.* at 711), they are regarded by the Census Bureau as residents of their college communities for purposes of legislative apportionment and the allocation of federal funds (Guido, *supra,* 47 *N. Y. U. L. Rev.* at 52; Note, "Student Voting and Apportionment," 81 *Yale L. J.* 35 (1971); *Borough of Bethel Park v. Stans,* 449 *F. 2d* 575, 579–581 (3 *Cir.* 1971)), and they are as well and perhaps "better informed on current issues than other citizens." 189 *N. W. 2d* at 432.

In reversing the lower court's refusal to register the plaintiffs in *Wilkins,* the court held that "in the future, students must be treated the same as all other registrants. No special questions, forms, identification, etc., may be required of students." 189 *N. W. 2d* at 434. Similar holdings may be found in *Anderson v. Brown, supra,* 332 *F. Supp.* 1195 and *Bright v. Baesler, supra,* 336 *F. Supp.* 527. In *Anderson* the court held that Ohio could not, in applying its voting tests, constitutionally differentiate between stu-

dents and others; similarly in *Bright* the court held that Kentucky could not constitutionally condition the right of students to vote at their college residences on their overcoming a presumption that they are domiciliaries of their parents' homes. In *Bright* the deputy county clerk testified that although no questions other than the routine ones were asked of applicants generally, a student applicant would be asked additional questions and if he lived on campus he would not be allowed to register. 336 *F. Supp.* at 532 n. 4. This course was held constitutionally impermissible; the court stated that it could not "conceive of any reason why it should not be presumed that student applicants for voter registration, like any other applicant, have made their application to register in good faith" and that while the student applicant might not be able to state with certitude that he intends to live permanently in the university community "such a declaration is not necessary to establish domicil." 336 *F. Supp.* at 533–534; see Singer, *supra,* 31 *Ohio St. L. J.* at 714; *cf.* Comment, "Student Voting Rights in University Communities," 6 *Harv. Civ. Rights—Civ. Lib. L. Rev.* 397, 407 (1971):

A student with an indefinite intention or an intent to leave after graduation may have a strong sense of community involvement while attending school, but one that is clearly limited in duration. These students may consider their school community a residence, may be affected by the outcomes of local elections, and may be concerned about and aware of community issues, values, and personalities. If the citizen were not a student, but a clergyman, businessman, or worker with equally limited intentions, registration would be permitted. All may possess common intentions, and none may have foreseeable connections with another community after completing their current program of work. For students with indefinite intentions or vague desires to move after graduating, a denial of registration may be a denial of equal protection of the laws. Registration tests that make it more difficult for non-native students to qualify than for other students or citizens with similar intentions should be prohibited.

These views were implemented in the recent holding by the United States District Court for the District of New

Hampshire in *Newburger v. Peterson,* 344 *F. Supp.* 559 (*D. N. H.* June 8, 1972). There a Dartmouth student who sought to vote at his college residence in New Hampshire was denied registration. He brought a class action attacking New Hampshire's position that since he firmly intended to leave Hanover upon graduation his residence there did not satisfy its requirement that one must have "an intention to remain permanently or indefinitely" to acquire a domicil sufficient for voting purposes. He prevailed in an opinion by Circuit Judge Coffin, joined by District Judges Gignoux and Bownes. Judge Coffin cited the Supreme Court's voting opinions and pointed out that *Dunn v. Blumstein, supra,* 405 *U. S.* 330, 92 S. Ct. 995, 31 *L. Ed. 2d* 274, had specifically denoted "as an 'impermissible purpose' the exclusion of college students who, on completion of their studies, 'move on.'" 344 *F. Supp.* at 562. He applied the test set forth in the Supreme Court opinions and concluded that New Hampshire had not shown that its requirement was needed to serve any compelling state interest; as he put it: "In this day of widespread planning for change of scene and occupation we cannot see that a requirement of permanent or indefinite intention to stay in one place is relevant to responsible citizenship." 344 *F. Supp.* at 563.

In *Newburger* the state did not suggest any danger of fraud or the overwhelming of the college community; its expressed reliance was on its interest in promoting "a more intelligent vote, especially in small communities, by insuring that voters have a commitment to the community and a stake in the outcome of local elections." 344 *F. Supp.* at 562. But as the court pointed out, if New Hampshire were actually to apply its requirement without improper discrimination it would exclude "a newly-arrived executive with a firm intention to retire to his Florida cottage at age 65, a hospital intern or resident with a career plan that gives him two or three years in New Hampshire, a construction worker on a long but time-limited job, an industrial or government trainee working up a precise career ladder, a

research contractor on a project with a deadline, a city manager hired for a term, a military person on a term of duty, a hospital patient with a hoped-for goal of discharge." 344 *F. Supp.* at 563. The court said that it failed to see how these people would possess any lesser "knowledge, intelligence, commitment, or responsibility" than those with more indefinite time schedules; it struck the New Hampshire requirement as "too crude a blunderbuss to pass muster." 344 *F. Supp.* at 563.

Unlike the plaintiff in *Newburger,* most students resident at college have no fixed plans as to their future residences and, when challenged on application for registration, will so state. As Singer, *supra,* has pointed out, if a student asserts that his plans as to future residence are uncertain but that he considers the college town his home for the present and has no intention of returning to his parents' home, he will "be allowed by the courts in most states to vote in his college town." 31 *Ohio St. L. J.* at 714; *Annot.,* 98 *A. L. R.* 2d 488, 497–498 (1964); *Annot., supra,* 44 *A. L. R.* 3d at 826–29. Although this action is taken without abandonment of the domicil requirement it may have pertinence to the growing recognition that domicil is not a unitary concept and that its application may vary in different contexts. See Reese, "Does Domicil Bear a Single Meaning?," 55 *Colum. L. Rev.* 589 (1955); Weintraub, "An Inquiry Into the Utility of 'Domicile' as a Concept in Conflicts Analysis," 63 *Mich. L. Rev.* 961, 983–86 (1965); *Restatement (Second) Conflict of Laws* § 11, comment o at 47–50 (1971); *cf. Gladwin v. Power,* 21 *A. D.* 2d 665, 249 *N. Y. S.* 2d 980, 982 (1st *Dept.* 1964); *In re Jones' Estate,* 192 *Iowa* 78, 182 *N. W.* 227, 229 (1921).

In his discussion of domicil, Professor Weintraub has noted that, while articulating the same technical definition of domicil, courts may vary its meaning "by shifting the emphasis to one or another element of the definition or by drawing different reasonable inferences from essentially the same fact pattern." 63 *Mich. L. Rev.* at 984. Earlier, Pro-

fessor Reese had expressed the thought that since courts are desirous of attaining the right result in the individual case it would be "surprising if they did not take advantage of the flexibility in application of the rules of domicil to achieve this end." 55 *Colum. L. Rev.* at 596–97. *Gladwin, supra,* may perhaps serve as illustrative of this flexibility. A candidate for the office of assemblyman had long maintained a residence for voting purposes. In upholding her right to vote and run for office from there, the court stated that "while there may only be one domicile for any particular purpose in the law it does not necessarily follow that the same concept of domicile will inevitably be the same in different areas of law"; it found that, both by intention and physical manifestation, she had established a sufficient residence "within the meaning of the Election Law." 249 *N. Y. S. 2d* at 982. The college student voting cases cited by Singer, *supra,* 31 *Ohio St. L. J.* at 714, may point in similar direction although it may be assumed that the same courts would adopt a stricter approach when confronted with out-of-state students claiming local college residences, not for voting purposes, but for purposes of preferential tuition treatment or the like. *Cf. Starns v. Malkerson,* 326 *F. Supp.* 234 (*D. Minn.* 1970), *aff'd,* 401 *U. S.* 985, 91 S. Ct. 1231, 28 *L. Ed. 2d* 527 (1971); *Thompson v. Board of Regents of University of Neb.,* 187 *Neb.* 252, 188 *N. W. 2d* 840 (1971); see Thompson, "The Problem of College Student Voting," 7 *Wake For. L. Rev.* 398, 418–19 (1971); *Singer, supra,* 31 *Ohio St. L. J.* at 720 n. 56.

At this juncture we may appropriately return to the New Jersey precedents and their current bearing in the voting field. The 1844 Constitution contained a provision in Article II for voting by residents but said nothing about domicil or student voting; indeed during the course of the convention which preceded its adoption, there was a proposal that "students who had taken up a transient residence for the purpose of education" be expressly excluded from those declared eligible to vote but it was roundly attacked and was

withdrawn. *Proceedings, New Jersey Constitutional Convention* 1844 at 92–95. Similarly the 1947 Constitution contains provisions in Article II for voting by residents but makes no reference to domicil or student voting. See *N. J. S. A.* 19:4–1, 2, 3; *cf. N. J. S. A.* 19:4–4.1 *et seq;* Assembly No. 985 introduced on April 6, 1972. It is true that as early as 1840 in *Cadwalader, supra,* 18 *N. J. L.* 138, our courts took the position that residence in a voting context meant domicil and that, though he lived at the college, a student was not to be deemed domiciled there but was to be deemed domiciled at his parents' home. That result was understandable in the light of the immobile times when college students retained close attachments to their parents' communities where they expected to return. In 1927 the Mercer County Counsel could properly cite *Cadwalader* and the cases which followed it, for his opinion which barred students resident at their colleges from voting there, absent some highly exceptional showing. Unfortunately this opinion, upon which the Mercer County election officials relied completely, was never updated or reevaluated in the light of the controlling developments which have already been outlined.

On May 4, 1971 New Jersey approved the twenty-sixth amendment and it did so with full awareness of its history and its implications. Political activism on college campuses had become commonplace, youthful independence had become even more commonplace, and the ancient concept of college as simply the interlude till the customary return home had become no longer viable. The goal was not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions. They were emancipated in fact by the new mobilities and freedoms and they were emancipated in law when the Legislature recently enacted that, effective January 1, 1973, they shall have "the basic civil and contractual rights and obligations heretofore applicable only to

persons 21 years of age or older." *L.* 1972, *c.* 81. The enactment removed the last vestige of legal obstacle to their establishment of domicil at their college residences even under the traditional notions of domicil and surely under the more modern non-unitary concepts; and it lent force to the position that, without more, they should currently have the right to vote at their college residences so long as they actually live there, are interested in and are concerned with their college communities, and assert in good faith their purpose of voting there and no place else.

When *Cadwalader, supra,* 18 *N. J. L.* 138, and the cases which followed it were decided, the compelling state interest test was of course unheard of, as was the current judicial approach which recognizes the right to vote as very precious and fundamental and carefully and meticulously scrutinizes efforts to restrict it. See *Reynolds v. Sims,* 377 *U. S.* 533, 561–562, 84 S. Ct. 1362, 12 *L. Ed.* 2d 506, 527 (1964); *cf. Williams v. Rhodes,* 393 *U. S.* 23, 30, 89 S. Ct. 5, 10, 21 *L. Ed.* 2d 24, 31 (1968); *Asbury Park Press, Inc. v. Woolley,* 33 *N. J.* 1, 11–12 (1960). Since it is so patently sound and so just in its consequences, we adopt the compelling state interest test in its broadest aspects, not only for compliance with the Federal Constitution but also for purposes of our own State Constitution and legislation; under the test a restriction against college students registering and voting in their college residence communities and not elsewhere during the extended time they actually reside there, must be stricken unless a compelling state interest to justify the restriction is shown. See *Dunn v. Blumstein, supra,* 405 *U. S.* at 342, 92 S. Ct. at 1003, 31 *L. Ed.* 2d at 284 *et seq.; Wilkins v. Bentley, supra,* 189 *N. W.* 2d at 425 *et seq.; but cf. Palla v. Suffolk County Board of Elections,* 31 *N. Y.* 2d 36, 286 *N. E.* 2d 247, 334 *N. Y. S.* 2d 860 (1972).

The State has of course an interest in preventing fraudulent voting but there has been no suggestion that the registration and criminal laws are not adequate in this connection or that there is any real danger of dual or improper

voting, once the right of students who choose to register and vote from their college residences and not elsewhere is recognized. The State also has an interest in promoting a more informed electorate and in insuring that the voters have an attachment to the communities from which they vote. So far as the informed electorate is concerned the college students have already indicated that they will more than hold their own; they have displayed special awareness in the political sphere, have actively participated in political campaigns, and have kept themselves thoroughly informed through public as well as college news coverage. Their interests have not been confined to federal matters but have extended to state and local matters. In this regard it may be noted that the Senate Report, *supra* at 12, which preceded the twenty-sixth amendment explicitly pointed out that if the energy and idealism of the young are needed in election politics, "they are needed no less at the State and local level" and that their participation in state and local elections is indeed appropriate since they are particularly concerned with matters of state and local policy including, *inter alia,* "the quality of education at all levels; the state of the environment; planning and community development." See *Jolicoeur v. Mihaly, supra,* 488 *P. 2d* at 6.

So far as the attachment to their college communities is concerned it must be borne in mind that we are dealing only with those resident students who have a sufficient subjective attachment to choose the college communities as their sole places for voting and a sufficient objective attachment through their physical residences in the college communities. Whether they live on or off campus they are subject to and concerned with not only the state laws and regulations but with the local laws and regulations as well. It is there that they pay their sales and gasoline taxes along with any other applicable charges, it is there that they deal with the local courts and local governmental bodies, and it is there that they are classified as residents by the Census Bureau. They are no more mobile than the general population, which has admittedly be-

come quite restless, and they are no more transient than many other groups whose right to vote in communities where they are short-term residents is never questioned. The fear seems to be that they might overwhelm a municipal election but that would present no valid legal ground for barring them, and, in any event, the many actual experiences to date furnish substantial support for the belief that the possibility is more theoretical than real and the fear is ill-grounded. *Jolicoeur v. Mihaly, supra,* 488 *P. 2d* at 8 n. 7; *Wilkins v. Bentley, supra,* 189 *N. W. 2d* at 433.

■ ■ In the light of all of the foregoing there remains little room for doubt that the individual plaintiffs who were bona fide campus residents in Mercer County, and others similarly situated, were improperly discriminated against by the Mercer County election officials and were improperly denied the right to register to vote in the communities where their college residences were located. They were subjected as a class to questioning beyond all other applicants, including applicants who were freely registered though their situations indicated that they were comparably short-term residents of their communities; and their applications for registration were rejected though they established that they actually lived at their campus residences, were interested in and concerned with the communities in which their campus residences were located, and asserted in good faith their purpose of voting there and no place else. All this was in violation of the legal principles approvingly expressed in this opinion and clearly called for broad judicial relief. Indeed, under those principles the relief granted below to most resident students should have been granted to all, including (1) those who plan to return to their previous residences, as well as (2) those who plan to remain permanently in their college communities, (3) those who plan to obtain employment away from their previous residences, and (4) those who are uncertain as to their future plans. The judgment below should be expanded to that end and early administrative steps should be taken to insure that all election officials throughout the

State carry out its full purport. Since we have found no merit in the appellant's attack on the Law Division's judgment it is, as thus expanded, hereby:

Affirmed.

WEINTRAUB, C. J., concurring. I agree with the result but I would rest it on a broader base. I believe that residence in fact for the prescribed period is all that may be required, no matter what may be the individual's attachments elsewhere, past, present, or prospective.

The concept of domicil is not constant. It is designed to assure fairness to the individual or the State or both in a given setting. Its ingredients therefore will vary, depending upon what is just and useful in a given context.

Here the subject is voting. Basic is the thought that a citizen is entitled to vote to further his political interests as he sees them. Everyone has a political interest everywhere he resides. It is the protection of that interest which the concept of domicil must reflect if it is to be other than arbitrary.

A man who resides in more than one place has more than one set of such interests. The right to vote being his, he, and he alone, can decide which interests are more important to him, and that decision should be final unless the State can demonstrate some public need to say some interests of his shall predominate over others. I do not know how the State could make that evaluation in our complex society. Nor can I find a need to impose a State-made decision upon any voter or group of voters. The State does have a proper concern to prevent multiple voting, for no voter is entitled to be counted twice in any election. To that end the State may require the individual to choose between or among his residences and make it an offense to vote at more than one place.[1]

---

[1]Abstractly an individual could say he should be permitted to vote on *local* issues in each political community in which he has a residence, so long as he does not thereby obtain a second voice upon

And it would be reasonable to bar voting by "floaters" who obtain a residence for the sole purpose of voting in a local election. But realistically that risk is remote, since voting in one place would bar voting elsewhere. In any event the State would be hard put to prove such a motivation. Except for that academic situation, I see no basis for the State to deny a man the right to vote where he resides or to decide for any voter that he ought to vote from one abode rather than another.

For this reason, a student, and a nonstudent as well, who satisfies the durational residence requirement, may vote where he resides, without regard to the duration of his anticipated stay or the existence of another residence elsewhere. It is for him alone to say whether his voting interests at the residence he selects exceed his voting interests elsewhere.[2]

WEINTRAUB, C. J., concurs in result.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN.—7.

*For reversal*—None.

---

any public issue. But the practical problems involved in attempting to regulate or supervise such dual voting are probably prohibitive and hence it is reasonable to limit voting to one residence for all purposes.

2 *N. J. S. A.* 19:4–4.1 permits a voter with multiple residences in this State to establish which is his voting residence. The statute, however, does not confer a right to choose; it appears to contemplate that the validity of the choice will be governed by criteria to be gathered elsewhere.