139 N.J. Super. 439 (1976)
354 A.2d 355
FRANCIS CARROLL, WILLIAM TORTORIELLO AND JOHN ALMY, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILIARLY SITUATED, PLAINTIFFS-RESPONDENTS,
v.
CAROL COBB, CLERK OF WOODLAND TOWNSHIP, AND BURLINGTON COUNTY BOARD OF ELECTIONS, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 1975.
Decided February 23, 1976.
*442 Before Judges FRITZ, SEIDMAN and MILMED.
Mr. Mark A. De Marco argued the cause for appellant Carol Cobb (Messrs. Donio & De Marco, attorneys).
Mr. Michael S. Bokar, Deputy Attorney General, argued the cause for appellant Burlington County Board of Elections (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
Mr. Sidney H. Lehmann, Assistant Deputy Public Advocate, argued the cause for respondents (Mr. Stanley C. Van Ness, Public Advocate, attorney; Mr. Herbert D. Hinkle, Assistant Deputy Public Advocate, of counsel and on the brief).
The opinion of the court was delivered by SEIDMAN, J.A.D.
These are consolidated appeals by Carol Cobb, Clerk of the Township of Woodland, and the Burlington County Board of Elections from a final judgment[1] entered in the Law Division directing the board to accept and process voter registration forms completed by five of the persons listed in the class of plaintiffs,[2] and to *443 permit them to vote in the November 1974 election; and to allow the remaining 28 persons in the class to register to vote and, if they satisfactorily completed the voter registration form, to vote in the said election.
The named plaintiffs and the class they represent are (or were at the time of the events leading to this litigation) adults living at the New Lisbon State School for the mentally retarded. On September 30, 1974 five of them, accompanied by Gary S. Zambor, the Director of Education at the school, went to Mrs. Cobb's office to apply for registration as voters. It is not controverted that she was authorized to accept such registration under N.J.S.A. 19:31-7. She told them at first that they could not register without a court order; however, after telephoning the county board of elections she said they would be allowed to do so if they could answer the questions on the form,[3] but (according to the testimony of Mr. Zambor, and not denied by Mrs. Cobb), she would not process the registrations until she received "clearance from her solicitor." Whether and to what extent the five had any problems with the questionnaire was in dispute at the hearing below; in any event, the forms were filled in and signed.
On October 3 a "busload of people" from the school who came to register were unable to do so because Mrs. Cobb was not available at the time. Later, when someone telephoned her in their behalf, she stated that she had been instructed by "her solicitor" and the county board of elections not to permit those persons to register without a court order.[4]
The Public Advocate then filed a complaint in lieu of prerogative writs and for declaratory relief alleging that of *444 the plaintiffs in the class, all of whom were evaluated pursuant to N.J.S.A. 30:4-25.3 and 25.4 and N.J.S.A. 30:4-165.5 and found not to be mentally deficient or incapable of managing themselves and their affairs, 15 had been evaluated as "dull normal" and the remainder as "mentally retarded." It was further alleged that Mrs. Cobb informed plaintiffs that she had been instructed not to permit the men to fill out the voter registration forms and to void those that had been previously completed, on the ground that they were "idiots or insane persons and thus precluded from exercising their right of suffrage due to the mere fact of their residence at New Lisbon State School." Plaintiffs sought a judgment, among other things, (1) ordering the township clerk and the county board to register all the members of the class and permit them to vote in the November 1974 election; (2) ordering defendants to "cease and desist" from any conduct or act which would "inhibit, impair or discourage" plaintiffs from exercising their right to vote, and (3) declaring the named plaintiffs "to be representatives of the class of all residents present and future of New Lisbon State School who otherwise qualify to vote and have not been declared to be incompetent."
An order was obtained directing defendants to show cause why the relief sought in the complaint should not be granted. On the return day of the order, after hearing testimony and considering the arguments of counsel, the trial judge said:
From what I have heard here, I am firmly convinced that the reason why those men were not permitted to vote was the hostility that the Municipal Fathers and even the County Board of Election had against people who were confined to such a school. I don't think that they really were concerned about their idiocy or their insanity because it hasn't been satisfactorily proven that these persons were in that category at all.
On the further issue of residence, the trial judge, holding that the Worden case (Worden v. Mercer Cty. Bd. of Elections, 61 N.J. 325 (1972)), gave "all powers to the people *445 in their right to vote," resolved the issue in favor of plaintiffs.
The thrust of the municipal clerk's argument on appeal is essentially two-fold: (1) that plaintiffs were ineligible to vote because they were not residents of Woodland Township, and (2) that they were further disqualified by constitutional and statutory provisions denying the right of suffrage to any idiot or insane person.[5]
The county board of elections contends that (1) county boards have the power and the duty to determine whether residents of state schools for the mentally retarded possess the requisite mental competency to vote, and where a county board determines an applicant to be disqualified the burden of proof rests upon the applicant in a subsequent judicial proceeding to establish his right to vote, and (2) persons living at State schools for the retarded who seek to register to vote are required to furnish information sufficient to show they are "residents" of the election district within the meaning of the Constitution (N.J. Const. (1947), Art. II, par. 3; and N.J.S.A. 19:14-1).
We intend to decide only those issues projected by the record before us. There are others, presented and argued in the respective briefs, which are of such breadth and importance that their resolution should be put aside to await an appropriate case. The issues which require our consideration in this case are relatively narrow, though by no means unimportant. We shall address ourselves later to the issue of plaintiffs' residence. The threshold problem pertains to the functions and authority of a municipal clerk, under N.J.S.A. 19:31-7, with respect to applicants for permanent voting registration.
*446 N.J.S.A. 19:31-1 et seq. provides for the permanent registration of eligible voters,[6] a prerequisite to voting at any election in any municipality in this State. Eligible voters may apply for registration, within the time prescribed by law, to those authorized to receive such applications,[7] or by completing and mailing a registration form (N.J.S.A. 19:31-6.3).
Applicants appearing in person are required to furnish under oath the information contained in the permanent registration form[8] and to affix their signatures or marks thereto. *447 (In the case of a mark, further identifying information must be given.) N.J.S.A. 19:31-3.[9]
The argument advanced in behalf of the municipal clerk is that she has certain discretionary powers as a registration official, among which is the right to deny registration to any person unable to answer the questions or provide the information required by N.J.S.A. 19:31-3. She maintains, further, that as a registration official she has discretion to determine what individuals "fall within the disqualifying clause of the State Constitution and of N.J.S.A. 19:4-1." More specifically, with reference to these plaintiffs or other like persons, she insists that "the clerk should have some discretion when an individual of this type is produced to determine that this individual is of such limited capacity as would make him inelligible [sic] to exercise the franchise."
A municipal clerk, in our view, has a limited function with respect to voter registration. It is simply to assure that an applicant is able to and does complete the form properly under oath and affix thereto either his signature or mark. We have no doubt that if an applicant for registration is unable for any reason to complete the form or to give affirmative answers to the questions concerning age, citizenship and residence, the application may not be received. The trial judge here found, on sufficient credible evidence present in the record, that the five plaintiffs answered the questions on the form. State v. Johnson, 42 N.J. 146, 162 (1964). All that remained to be done by the municipal clerk was to comply with the statutory direction to "transmit daily to the commissioner [of registration] all of the filled out forms [s]he may have in [her] office at the time." N.J.S.A. 19:31-7. She was without power to subject "a class to *448 questioning beyond all other applicants." Cf. Worden v. Mercer Cty. Bd. of Elections, supra, 61 N.J. at 348.[10]
The municipal clerk in this case insists, however, that she is vested with discretion to determine whether to reject an applicant for registration who lacks sufficient mental capacity to vote. We deem the contention untenable. While it is true that persons applying for registration who meet the voter requirements of age, citizenship and residence may still not be entitled to register if they are otherwise disqualified, N.J.S.A. 19:31-5, and "idiots" and "insane persons" are disqualified from voting, it should be abundantly evident that a lay person is completely unequipped to determine whether an applicant is either an "idiot" or an "insane person," as those terms are used in the Constitution and the statute, and thus disenfranchised. Indeed, we suspect that those imprecise terms may be troublesome to experts in the fields of psychiatry or psychology.
Moreover, we perceive no merit in the attempt to overcome this hurdle, both below and on this appeal, by asserting that a rebuttable presumption of idiocy or incompetency arises "from the determination that an individual is eligible for residential functional services" at an institution for the mentally retarded. Significantly, this position is at variance with the view expressed below by the deputy attorney general who appeared for the county board of elections, that "we would agree with the plaintiffs to the extent that the mere fact of residency in a State Institution does not entitle the Board of Elections to make a final presumption of idiocy."
In fact, the statute dealing with the admission of mentally ill or retarded persons to state hospitals or schools in effect at the times involved in this case, N.J.S.A. 30:4-23 et seq., specifically provided that
*449 Subject to the general rules and regulations of the facility and except to the extent that the head of the facility determines that it is necessary for the medical care and treatment of the particular individual to impose restrictions, every patient shall be entitled:
(1) to exercise all civil and religious rights provided for under the Constitutions and the laws of the State of New Jersey and the United States, unless he has been adjudicated incompetent and has not been restored to legal capacity; * * * *
For the purpose of a patient's exercising his civil rights there shall be no presumption of his incompetency or unsoundness of mind merely because of his admission to a mental hospital. * * * * [N.J.S.A. 30:4-24.2.][11]
As for the county board of elections, we are entirely satisfied that it has the responsibility to assure that only properly qualified persons are registered to vote. See Edelstein v. Ferrell, 120 N.J. Super. 583, 594 (Law Div. 1972). We need not, however, probe the outermost reaches of the board's broad assertion of its power and duty to determine whether residents of state schools for the mentally retarded possess the requisite mental competency to vote. Nor shall we assess the correctness of its further contention that where a county board determines an applicant to be disqualified, the burden of proof rests upon the applicant in a subsequent judicial proceeding to establish his right to vote. The record in this case does not disclose that the county board of elections here actually made a determination of plaintiffs' disqualification on account of their alleged mental incompetency, or, if it was made, when, on what basis and in what manner it was done. Moreover, especially since the board argues further that the burden rests upon the applicant "in a subsequent judicial proceeding to establish his right to *450 vote," we have no evidence that any of the plaintiffs were notified, formally or otherwise, of their disqualification and the reason therefor, or given an opportunity to be heard thereon.
We do not intend to write a handbook on the subject for the guidance of county boards of elections. But we should say at least this much, that a mentally retarded person need not be an "idiot," and a mentally ill person need not be "insane." We leave for another day the determination of where to draw the line of demarcation, beyond which disenfranchisement results.[12]
*451 Counsel for plaintiffs and the class they represented chose to present evidence at the hearing below relating to their mental capacity. Dr. Bernard White, Deputy Director of the Division of Mental Retardation, Department of Institutions and Agencies, testified that New Lisbon State School was one of seven State schools for the mentally retarded. He said that anyone with an I.Q. of 35 or more who could care for himself and get along with others was classified as retarded but not mentally deficient, and that anyone not mentally deficient could not be considered an idiot. He mentioned that 30 residents at the Vineland State School and 4 at the Johnstone Training Center were registered to vote. Many of the residents at the schools, he said further, receive educational training and are expected to return to their families and communities. The assistant superintendent of the New Lisbon State School testified that all of the 33 members of the class of plaintiffs were New Jersey residents, none had court appointed guardians, all were competent to manage their own affairs, and none could be considered an idiot.
The trial judge said that
The whole concern seems to be that these individuals are not qualified either by Statute or by the Constitution in that their mentality is such that they should be permitted to vote, and I don't think that that has been established satisfactorily to me.
A specific finding of fact on the issue would have been preferable since the above excerpt suggests that the result *452 was reached because defendants had the burden of proving that plaintiffs were disqualified from voting and failed to carry that burden, and we do not feel it incumbent upon us to determine now where the burden of proof lies in a situation such as this. However, implicit in the trial judge's remarks is the conclusion that plaintiffs were not so mentally deficient as to be disenfranchised. Our independent evaluation of the transcript satisfies us that such conclusion finds ample support in credible evidence present in the record. State v. Johnson, supra.
Counsel for the municipal clerk assigns as error the admission into evidence of a list of the 33 plaintiffs, prepared by the school administrator, in which they were divided into two categories, (1) retarded but not deficient, and (2) "dull-normal." The objection below was that "the list represented opinion, was secondary evidence as compared to the records from which it was compiled and was heresay [sic] in that it was a document purporting to assert the truth of the assertions therein without any foundation being laid." We perceive no merit in these arguments. The assistant administrator of the school testified to the evaluation of the 33 men based upon his knowledge of their records. The list itself merely reflected the two categories in which the men were placed. The contention that the best evidence of the classifications was the records themselves overlooks N.J.S.A. 30:4-24.3, which declares such records confidential and prohibits their disclosure, excepting certain situations not pertinent here, unless "a court [so directs], upon its determination that disclosure is necessary for the conduct of proceedings before it and that failure to make such disclosure would be contrary to the public interest." While the issue of the records was not presented or determined below within the framework of the statute, we are satisfied nonetheless that in the circumstances of this case the public interest did not warrant the disclosure of the confidential records of the plaintiffs
*453 We direct our attention now to the issue of residence. The municipal clerk urges that plaintiffs and the class they represent are not residents of the Township of Woodland and are, on that account, ineligible to vote. She argues that (1) for these plaintiffs to be eligible for the services offered by the New Lisbon State School, they must have been evaluated as in need of functional residential services; (2) since such persons still reside at the school "because they have not been able to adjust when they have been sent out into the community," they are patients "within the meaning of the law"; (3) therefore, "this brings the instant case squarely under the doctrine of Perri v. Kisselbach, 34 N.J. 84," and plaintiffs have no right to vote. The county board of elections does not go that far. It reasons that (1) since everyone is deemed to have a domicile at all times, "it may be that even though plaintiffs, as voluntary residents, were free to leave New Lisbon at any time * * * plaintiffs could have demonstrated that they were domiciliaries of Woodland Township"; (2) or "it may be that the relatively short period of time some or all of the plaintiffs lived at New Libson, if such was the case, coupled with their continued strong ties to their former communities and a concomitant absence of interest in local affairs in Woodland Township would have precluded their establishing a domicile there;" (3) the fact is that "plaintiffs failed to meet their evidentiary burden of showing they were Woodland residents, and (4) that being so, "the trial court erred in ordering the defendants to allow them to register and vote there."
It thus appears that the municipal clerk seeks to equate the state school with a hospital, so that plaintiffs, as patients therein, would not be capable of forming a legally effective intention to reside indefinitely at the institution. She relies, as indicated above, on Perri v. Kisselbach, 34 N.J. 84 (1961). On the other hand, the county board of elections more realistically recognizes the issue to be one of intent on the part of each plaintiff, applying the tests discussed in Worden v. Mercer Cty. Bd. of Elections, supra. Plaintiffs' *454 position, which seems more responsive to the clerk's arguments than to those presented by the board, is that the mere fact that plaintiffs are residents of a state school "cannot bar them from voting as residents of Woodland Township."
We are in substantial agreement with the concepts of both plaintiffs and the board, although, as to the latter, we do not necessarily conclude therefrom that the trial judge erred in ordering that plaintiffs be allowed to register and vote.
Whatever vitality Perri may still have, in light of Worden, it does not support the view that these plaintiffs, and the class they represent, cannot under any circumstances be residents of the municipality in which the school is located. Perri involved the validity of absentee ballot votes cast by patients in a county tuberculosis sanatorium located in the election district in question. Under applicable statutes, the hospital managers were empowered "to hold and detain any patient * * * when in their judgment it is for the benefit of said patient or for their community that said patient remain there," and were required to "discharge a [tuberculosis] patient whenever cured or whenever further detention would not benefit the patient or the community." The court noted that to acquire a domicile of choice there must be physical presence in the place where domicile is alleged to have been acquired and an intention capable of execution to make that place the home. It said, further, that in order to hold that one "actually resides" in a certain place, "he is required to maintain such a relationship with the place or premises so selected as will entitle him at his will to occupy that place or premises whenever his necessities or pleasure require without having to ask the permission of someone else." The court concluded that the pertinent statute prevented the patients "from forming a legally effective intention to remain indefinitely at the sanatorium." 34 N.J. at 88-89.
Viewing the issue as solely one of residence, and setting apart the factor of mental competency to assert a *455 good faith purpose to vote in the community in which their school is situated, we see no substantial reason for not applying to those residents at the New Lisbon State School who would otherwise be eligible to vote, what the court said in Worden v. Mercer Cty. Bd. of Elections:
In the light of all of the foregoing there remains little room for doubt that the individual plaintiffs who were bona fide campus residents in Mercer County, and others similarly situated, were improperly discriminated against by the Mercer County election officials and were improperly denied the right to register to vote in the communities where their college residences were located. They were subjected as a class to questioning beyond all other applicants, including applicants who were freely registered though their situations indicated that they were comparably short-term residents of their communities; and their applications for registration were rejected though they established that they actually lived at their campus residences, were interested in and concerned with the communities in which their campus residences were located, and asserted in good faith their purpose of voting there and no place else. All this was in violation of the legal principles approvingly expressed in this opinion and clearly called for broad judicial relief. Indeed, under those principles the relief granted below to most resident students should have been granted to all, including (1) those who plan to return to their previous residences, as well as (2) those who plan to remain permanently in their college communities, (3) those who plan to obtain employment away from their previous residences, and (4) those who are uncertain as to their future plans. [64 N.J. at 348]
We conclude, therefore, that residence at the New Lisbon State School does not per se render one who meets all other voting requirements ineligible to vote. However, we must recognize that the type of institution here involved is obviously vastly different from a college or university. Accordingly, we emphasize the basic premise that the resident who seeks to vote is not disqualified by reason of any "idiocy" or "insanity" thought to spring from that residency alone, and may have "a sufficient subjective attachment" to choose the school community as his sole place for voting and a "sufficient objective attachment" through his physical residence in the school community.
*456 The only proofs submitted below on the issue of whether plaintiffs were bona fide residents of the municipality in question for voting purposes were that all 33 members of the class were voluntary residents at the state school, free to leave as they wished, and, in the case of plaintiff Francis Carroll, that he was 47 years of age and had resided at the school for 26 years. The trial judge did not discuss whether the "subjective-objective attachment" tests of Worden had been met. He merely commented that "the Worden decision could be made applicable to this situation," and that Worden seemed to concentrate "more on where you are living" than on "domicile."
We do not mean to imply that the members of the class in this case may not have been bona fide residents of Woodland Township. So long as they were properly registered and were not outside the ambit of Worden, or otherwise disqualified, they were entitled to vote. But we do not intend to foreclose the county board of elections, on an individual basis and for specifically stated reasons, from reviewing and challenging the voting qualifications of any member of the class, so long as it is done in the manner provided by law.
We iterate that we limit our determination to the 33 persons listed in the complaint, and we express no opinion with respect to any other resident of the school who may also wish to register and vote in Woodland Township.
The judgment is affirmed. No costs.
NOTES
[1] The order below specified that it "shall be construed as a Final Judgment in this action for all purposes, including appeals." Although the copy of the order which appears in the appendix to the brief of appellant Carol Cobb is neither signed nor dated, we assume the entry of a duly executed order. We note a statement in the "Counter Procedural History" in respondents' brief that the decision was "formalized in an Order dated November 8, 1974."
[2] The action involved herein was certified in the final judgment to be a class action, the entire class to consist of 33 persons listed in Appendix A annexed to the complaint.
[3] This refers to the voter registration form prescribed by N.J.S.A. 19:31-6.4.
[4] At the hearing below, counsel for Mrs. Cobb stated that the legal conclusion had been reached "on the evidence that we were provided and the material available to us" that no residents of the New Lisbon State School should be permitted to vote.
[5] "No idiot or insane person shall enjoy the right of suffrage." N.J. Const. (1947), Art. II, par. 6.

"No person shall have the right of suffrage 
(1) Who is an idiot or is insane * * *" N.J.S.A. 19:4-1(1).
[6] Every person possessing the constitutional qualifications of citizenship, age (18 years) and residence in the State and county (30 days next before the election) is entitled to vote, N.J. Const. (1947), Art. II, par. 3, unless disqualified by virtue of Art. II, par. 6 (idiocy or insanity), or for the statutory reasons contained in N.J.S.A. 19:14-1.
[7] The commissioner of registration (who is the superintendent of elections in counties having such officials or the secretary of county boards of elections elsewhere), members of county boards of elections, his or their duly authorized clerks, and the respective municipal clerks or their duly authorized clerks, are empowered to receive applications. N.J.S.A. 19:31-6 and 7.
[8] The permanent registration form contains the following information concerning each applicant for registration:

(1) The full name, including middle initials, if any.
(2) The place of residence and street address. If the applicant resides in a hotel, apartment or tenement house or institution, such additional information shall be included as may be deemed necessary to give the exact location of the applicant's place of residence.
(3) The applicant's statement that he is 18 years of age or over, that he is a citizen of the United States and of the State of New Jersey, that he will have resided in the State of New Jersey for at least 30 days and in the county for at least 30 days immediately preceding the next general election, all of which shall be indicated by the word "Yes."
(4) Whether he is a native-born citizen or a citizen by naturalization.
(5) The name of the municipality and house number and street in such municipality from which he last registered.
[9] The form used for registering by mail contains the same information, although in a different format, and the applicant's signature or mark must be witnessed by a registered voter. N.J.S.A. 19:31-6.4.
[10] Whether all the remaining 28 plaintiffs in the class subsequently appeared in person and satisfactorily completed the voter registration form, is not indicated in the record.
[11] It is noteworthy that this section was recently amended (L. 1975, c. 85, § 2, effective May 7, 1975) so as to provide, in the case of the mentally ill, that no patient should be deprived of any civil right solely by reason of his receiving treatment, "including but not limited to the right to register for and to vote at elections * * * *." A bill pertaining to the mentally retarded (S. 3396, introduced October 23, 1975), which contained a similar provision, was still in committee when the 1975 legislative term ended.
[12] The ancient inquisition in the nature of a writ de lunatico inquirendo required a showing on the return that the individual was so far bereft of reason as to justify his being deprived of power over both his person and his property. A return that a party was an idiot, or a lunatic, or non compos mentis, or of unsound mind, was sufficient, because each of those terms imported such a deprivation of sense as rendered the sufferer unfit for control, as well as for the management of his own affairs. Lindsley's Case, 44 N.J. Eq. 564, 566 (E. & A. 1888). An "idiot" has been defined as "a person who has been without understanding from his nativity, and whom the law, therefore, presumes never likely to attain any." Black's Law Dictionary (Rev. 4 ed. 1968). Medically, the term means a "person congenitally without understanding or ordinary mental capacity." Stedman's Medical Dictionary (3d Lawyers ed. 1972). "Insanity" is a "[n]ow outmoded term, more or less synonymous with severe mental illness or psychosis." Stedman, op. cit. The laws of this State pertaining to the commitment and admissions of persons to state institutions, speak of "mental illness" and "mental retardation." The former means "mental disease to such an extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of others, or of the community;" the latter, "a state of significant subnormal intellectual development with reduction of social competence in a minor or adult person * * * [which] shall have existed prior to adolescence and is expected to be of life duration." N.J.S.A. 30:4-23. "Mental deficiency" is defined as "that state of mental retardation in which the reduction of social competence is so marked that persistent social dependency requiring guardianship of the person shall have been demonstrated or be anticipated." Id.

In its final report to the Governor and Legislature, the New Jersey Election Law Revision Commission described Title 19 (the Election Law) as a "relic of the days of horse carts, which has been modernized up to the days of trolley cars." 98 N.J.L.J. 401 (May 8, 1975). It proposed to revise N.J.S.A. 19:4-1 by substituting the language, "who has been adjudged mentally incompetent," for "one who is an idiot or is insane" in the ancient statute. It said:
* * * [t]he Commission recognizes that its substituted language may not be a complete solution to this troublesome problem, where a fine constitutional balancing of individual rights with a significantly free exercise of the franchise is necessary. Indeed, the final answer may have to await changing judicial conclusions of constitutional construction. In any event, it was decided that the existing language was so imprecise as to require its removal. [Id. at 410]