The Honorable Dan Greenberg State Representative
608 West Commerce Drive, Suite 1 Bryant, Arkansas 72022-6202
Dear Representative Greenberg:
I am writing in response to your request for my opinion on a question I will paraphrase as follows:
 Is there a special constitutional duty on the part of the state legislature under Article 19, section 19, to support the education and/or treatment of those who lack the ability to "understand or carry on the ordinary affairs of life" — particularly those who have the type of developmental disorders that would have been diagnosed, at the time that the Constitution became law, as "insane"?
Although you address broadly the question of developmental disorders, your question as posed appears particularly concerned with the issue of whether Article 19 applies to all or some autistic individuals.
RESPONSE
In my opinion, although it may be a salutary goal to provide those with severe developmental disorders and needs with some form of legislative assistance, I cannot opine that providing such assistance is constitutionally required. As you suggest in your request, the operative inquiry may well be whether a particular individual falls within the parameters of "insanity" as that term was conceived in 1874, when Article 19, § 19 was ratified. Alternatively, the constitutional provision might be read as covering only "insanity" as that term is currently understood. In either case, the pertinent inquiry in any given case will necessarily *Page 2 
be factually intensive and hence beyond the scope of an official opinion arising from this office.
As you note in your question, Ark. Const art. 19, § 19 provides as follows:
 It shall be the duty of the General Assembly to provide by law for the support of institutions for the education of the deaf and dumb, and of the blind; and also for the treatment of the insane.
You profess in your question as posed an originalist belief that Article 19 should be applied only as it was or might have been applied at the time of its ratification in 1874. In this regard, you make the following representation, albeit without offering any direct supporting authority:
 When Article 19 of the Constitution was ratified, it is probably fair to say that the class of those who were then diagnosed as "insane" included many whose only disability was what we would call today a developmental disorder.
You go on to suggest that "there is evidence-based research demonstrating that autism," which you characterize as a variety of developmental disorder, "is treatable by means of educational therapy such as applied behavior assessment, but a defining characteristic of developmental disorders is typically that they are not treatable."
In connection with the points set forth in my previous paragraph, you have listed a variety of factors that the Division of Developmental Services ("DDS") apparently applies in determining whether an individual is severely disabled to the point that he might be eligible for admission to an intermediate-care facility — criteria you suggest are used to determine whether that individual has the ability to "understand or carry on the ordinary affairs of life."
You appear to assume in your question that an inability to "understand or carry on the ordinary affairs of life" in effect amounts to "insanity" for purposes of triggering the governmental obligations set forth in Article 19, § 19. It is unclear how this assumption relates to your rather casual suggestion that "it is probably fair to say that the class of those who were then [in 1874] diagnosed as `insane' included many whose only disability was what we would call today a *Page 3 
developmental disorder." Further obscuring the thrust of your proposed argument is your suggestion that autism, which you concede is different from "insanity" under modern analysis, is somehow further different from other developmental disorders insofar as autism is unique in being treatable.
Your assertions thus boil down to the following: (1) for purposes of this question, the appropriate way to interpret the scope of coverage under Amendment 19 is to determine what "insanity" meant in 1874; (2) "it is probably fair to say" that insanity in 1874 included developmental disorders — a category that includes autism[1]; (3) autism differs from other developmental disorders in being treatable — an alleged factor that I assume you find significant because Amendment 19 calls for the "treatment of the insane"; and (4) under modern DDS guidelines, at least various autistic persons might be entitled to treatment at an intermediate-care facility.
In interpreting these suggestions, I should note initially that there appears to be a logical tension between items (1) and (4) recited in the previous paragraphs, given that modern DDS guidelines for determining an individual's entitlement to treatment at an intermediate-care facility should be immaterial in determining what was deemed to constitute "insanity" in 1874. Moreover, even assuming that 1874 is the operative date for determining what ailments fall under Article 19, § 19, it is insufficient merely to assume that developmental disorders must have been included among these ailments in 1874, just as it is insufficient simply to declare that autism, unlike other developmental disorders, is uniquely treatable and thus within the coverage of Article 19, § 19. These are factual questions that must be resolved by a trier of fact, not by this office in its capacity as an advisor to qualified requestors regarding the constitutionality and the terms of existing or proposed laws. Finally, I should note that the DDS guidelines for authorizing treatment at an intermediate-care facility are purely statutory in origin and consequently do not implicate the separate question of what establishes a person as "insane" under the constitutional standard set forth in Article 19, § 19. *Page 4 
With respect to the difficulty of defining a term like "insanity," whether in the distant past or presently, my predecessor in Op. Att'y Gen. No. 92-342, which addressed the entitlement of the mentally handicapped to vote under applicable constitutional and statutory law and which you reference in your request, offered the following:
 None of these provisions specifically address the issue of mentally handicapped voters, and as a result are, in my opinion, inadequate to give election officials the guidance they need in administering the election laws, or to protect the fundamental rights of mentally handicapped voters. As stated in Carroll v. Cobb, 139 N.J. Super. 439, 354 A.2d 355 (1976), "[i]t should be abundantly evident that a lay person is completely unequipped to determine whether an applicant is either an `idiot' or `insane person,' as those terms are used in the Constitution and the statute, and thus disenfranchised.
 Indeed, we suspect that those imprecise terms may be troublesome to experts in the fields of psychiatry or psychology." Id. at 359.
My predecessor addressed, inter alia, the meaning of "insane" as used in Ark. Const. art. 3, § 5, which provides: "No idiot or insane person shall be entitled to the privileges of an elector." In distinguishing the term "insane" from various other terms used in statutes that at times related to a constitutional provision, my predecessor remarked:
 The term "insane person" . . . was a broader term which encompassed both "idiots" and "lunatics," the former being persons without understanding from birth, and the latter once having been of sound mind, but who have lost their reason, with lucid intervals. [Citations omitted.] "Insane persons" are generally incapable of understanding or carrying on the ordinary affairs of life. 80 ALR 3rd at 1123. See also Pulaski County v. Hill, 97 Ark. 450, [134 S.W. 973] (1911).
In my opinion, it would be inappropriate to extrapolate from this passage a conclusion that anyone who is "generally incapable of carrying on the ordinary affairs of life" is "insane" in all constitutional or statutory contexts. The referenced ALR annotation, 80 A.L.R.3d 1116, Voting Rights of Persons Mentally *Page 5 
 Incapacitated (1977), recites only two out-of-state cases as supporting the proposition that an "insane person" is one "of unsound mind who is incapable of understanding or carrying on the ordinary affairs of life." Id. at § 3[a]. Although the Arkansas Supreme Court essentially echoed this coinage in Hill, it did so only within the context of a statute determining whether a disabled individual should be granted time, until the disability was lifted, to redeem property from a tax sale. Neither this case nor any other Arkansas case at any point addressed the scope of the term "insane" as used in Article 19, § 19 or any other constitutional provision.
I need not address whether the framers of the constitution intended that the applicable definition of "the insane" be frozen in time as of Amendment 19's 1874 ratification date. I can only note that the question of what is included within that designation is intensely factual and, as such, beyond the scope of an official Attorney General opinion. This office is neither equipped nor authorized in an opinion to inquire into what constituted insanity in 1874 or what does so today. I cannot base an opinion on the scope of "insanity" under Article 19 on mere speculation regarding what may have fallen under that rubric in 1874 or, assuming the designation "insane" still means anything today, what might currently fall under that rubric. These are matters appropriately addressed by the legislature and/or the courts.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL
Attorney General
[1] In offering the following, you suggest that this inclusion of autism within the category of insanity would not apply today:
 I am not suggesting that people with autism are insane. I am only suggesting that some citizens who were classified as "insane" at the time of our state's Constitution would now routinely be diagnosed as autistic.